196 N.J. Super. 286 (1984)
482 A.2d 199
MAYOR H. PAUL, ET AL., PLAINTIFF-APPELLANT,
v.
OHIO CASUALTY INSURANCE COMPANY, ET AL. DEFENDANT-RESPONDENT.
OHIO CASUALTY INSURANCE COMPANY, PLAINTIFF-RESPONDENT,
v.
MAYOR H. PAUL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1984.
Decided October 5, 1984.
*288 Gerald M. Eisenstat argued the cause for appellant (Shapiro, Eisenstat & Gabage, attorneys).
Arthur Montano argued the cause for respondent (Montano, Summers, Mullen, Manuel & Owens, attorneys; Arthur Montano and Arthur E. Donnelly III, on the brief).
Joseph H. Rodriguez, Public Advocate, filed an amicus curiae brief (R. Michael Kemler, Assistant Deputy Public Advocate, on the brief).
The opinion of the court was delivered by PETRELLA, J.A.D.
This appeal by Mayor H. Paul in his dispute with Ohio Casualty Insurance Co. (Ohio Casualty) involves the interpretation of the term "medical expenses" in the personal injury protection (PIP) provisions of the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1, et seq. (the "No-Fault Law"). The trial judge concluded that 24 hour a day attendant care and the services of a health care coordinator for plaintiff, a quadriplegic with "Locked-In Syndrome," were not "medical expenses" under N.J.S.A. 39:6A-4 and N.J.S.A. 39:6A-2e and ruled in favor of defendant insuror. We reverse.
Mayor H. Paul, then a 23 year old teacher, was injured in an automobile accident on Route 206 in Springfield Township on January 11, 1975. As a result of that accident Paul received a brain stem injury which rendered him a quadriplegic with what is known as "Locked-In Syndrome." Although similar to spinal cord injuries where there is resultant quadriplegia, the victim of "Locked-In Syndrome" generally maintains cognitive abilities, but is unable to speak or hold his head erect and is unable to respond rapidly if at all. The usual spinal cord patient generally has loss of motion and sensation below the injury but needs no training in speech or communication skills. The "Locked-In Syndrome" patient has similar loss of movement but retains sensation. Without development and training, the "Locked-In *289 Syndrome" patient cannot communicate or develop the means to do so. Shortly after the accident Ohio Casualty, Paul's automobile insurance carrier, began paying him PIP benefits. These payments eventually included payments for attendant care which the insurer continued paying until it instituted a declaratory judgment action.
In April 1982 Ohio Casualty filed a complaint in the Chancery Division[1] against Paul and his parents seeking a declaratory judgment that it was not required to pay for Paul's full-time attendant care or his health care coordinator. Paul counterclaimed in that action for a declaration that Ohio Casualty was obligated to pay not only for those services, but for the payment of essential service benefits including a professional psychologist, physical therapist and speech therapist.
Paul had previously filed a negligence action in the Law Division seeking damages against a number of defendants for his personal injuries arising out of the accident. After Ohio Casualty instituted its suit, Paul filed a supplemental complaint in that Law Division action seeking essentially the same relief against Ohio Casualty as he sought in his counterclaim in the Chancery Division. The Chancery Division action was transferred and consolidated with the pending Law Division action. The personal injury claims in the Law Division were settled and trial was held solely on the remaining declaratory judgment aspects of the litigation. At the end of Paul's case in a non-jury trial the trial judge granted Ohio Casualty's motion for involuntary dismissal as a matter of law and denied Paul's claim for entitlement to payment of the health care coordinator and attendants based on Ohio Casualty's argument that such services did not fit within the definition of medical expenses *290 under N.J.S.A. 39:6A-2e. The judge concluded that attendant care and the services of a coordinator should not be considered treatment within the terms of that statute. Ohio Casualty then rested and the judge entered judgment in favor of Paul on the essential services claims. The judge ruled that psychotherapy, speech therapy and the physical therapy rendered to Paul were necessary medical expenses and that the charges for them were reasonable and that their need continued until there was contrary proof. That determination is not the subject of any appeal.
Paul appealed from the judgment in favor of Ohio Casualty as to the health care coordinator and attendant care. No cross appeal was filed by Ohio Casualty on the ruling on the essential services claims.
The record of the four-day trial regarding Paul's claims for payment of expenses under the PIP provisions of the Ohio Casualty policy contains additional facts that we refer to hereinafter. After the accident Paul had spent a number of months in various rehabilitation institutions. Upon discharge from Kim Institute, Paul went to live in his parent's home in late 1975 under the supervision of a rehabilitation team which included an around-the-clock nursing staff, a speech therapist and a physical therapist.
Significant progress was made in Paul's rehabilitation so that he was able to eat by mouth instead of having to use a stomach tube. He was also able to reduce some of his drooling, attain some control over bowel and bladder functions and gain some muscle control. As the years passed the virtually daily visits from his attending physician declined in frequency because various medical conditions common to the profoundly disabled, i.e., respiratory and skin infections, cleared up and did not reoccur.
In late 1980 Paul's father's health deteriorated, making it physically difficult for his father and psychologically difficult *291 for Paul to remain in his parent's house and receive care from them.
In January 1981 a decision was reached between Paul, his doctor and Ohio Casualty to establish him in an independent living arrangement. An appropriate apartment was obtained near his parent's home. Ohio Casualty inspected the proposed apartment and retained its own consultant who made specific suggestions as to household design and items to be included. Ohio Casualty also financed the renovations to accommodate the move. In addition, Ohio Casualty's reinsurer, General Reinsurance Corporation, brought in its own neurological consultant, Dr. Vinod Sahgal, from the Rehabilitation Institute of Chicago for a neuro-rehabilitation evaluation. That consultant recommended continuing medical follow-up by a general practitioner and recommended rehabilitation services consisting of maintenance physiotherapy with emphasis on range of motion, joint positioning, standing with assistance if he desired, and the use of resting hand splints to ward off contractures. He prescribed an automatic page turner for Paul to facilitate his reading and also recommended exploration every two years for more sophisticated communication devices.
Dr. Sahgal also recommended that Paul undergo an active socialization program. He noted that Paul was incapable of handling himself independently and needed attendants to take care of him for the duration of his life to avoid costly future hospitalization and medical intervention. In his opinion attendants could reasonably provide for Paul's care to avoid the necessity of registered nurses or licensed practical nurses who it was expected would be more costly. In a report dated February 13, 1981[2] Dr. Sahgal had recommended a live-in attendant of Paul's own age who could complement Paul's abilities and disabilities. The report concluded: "An independent *292 living situation is also not an unreasonable goal provided attendants can be hired."
Paul moved into his own four-room apartment in the spring of 1981. A coordinator was hired to manage Paul's household and the services provided by the attendants. The coordinator had previously been an attendant for Paul and had had some training in hospital nursing, gerentology, rehabilitation and stress management. This coordinator worked about 20 to 25 hours per week and received $190 per week for her services. She took care of the payroll for the three attendants who worked the shifts full-time during the week and for the three week-end part-time attendants. She also scheduled the shifts and made sure that someone was available to cover a shift in case an attendant was sick or needed a day off. She advertised for help when needed and interviewed and checked the references of people recruited as attendants. She required that applicants have a driver's license, experience as a nurse's aide and in dealing with the handicapped and be able to spell reasonably well.
The coordinator was also responsible for training new attendants on the use of Paul's equipment; assisting in training his attendants in physiotherapy and speech therapy treatments; instructing attendants on how to communicate with Paul; ordering and shopping for medical supplies; maintaining his equipment, and coordinating the various types of activities that would be engaged in by a person who could take care of himself. From the time the coordinator was utilized until the trial began on April 26, 1983, she had been paid $12,865.
Apparently Paul does not presently require constant medical supervision. His physician, however, was of the opinion that he continued to need the constant stimulation of physical and speech therapy which is provided by his attendants.[3] The *293 attendants also provide Paul with daily physical care which includes bathing, feeding, bandaging of his hands and transportation to and from any activities in which Paul may participate. Ohio Casualty had initially provided funds under its policy's PIP coverage to pay for attendants, but it refused to pay for the services of the coordinator. When Ohio Casualty sought relief in litigation from the requirement to even pay for the attendants, Paul argued that it should be estopped from declining payment for the attendants because Ohio Casualty had paid for them for a considerable time.
Various experts testified at the trial on Paul's case as to the program of rehabilitation and the treatments Paul received as well as the necessity of the attendants. A psychologist testified that Paul had been suffering from a full depression syndrome, was under extreme stress and had attempted to commit suicide by starvation and other means. Dr. William Erdman, a specialist in physical medicine and rehabilitation testified that there is no known cure for "Locked-In Syndrome." Dr. Erdman indicated, however, that a person with that condition must continue with therapy to prevent deterioration of the muscles and to maintain some muscle control so that in the event of a breakthrough, or the invention of some remedial device, the individual would not be prevented from making use of the advances due to muscular atrophy. Although restoration to full physical capacity is presently impossible for Paul, the palliative and remedial therapies which are available and which may appear minor to the outside world were, in his opinion, of earth-shattering importance to the individual involved. We find it unnecessary to further detail that testimony.
At the end of Paul's case the judge in his ruling stated that although he felt that the attendants were appropriate, these services were not a medical expense under N.J.S.A. 39:6A-2e *294 and the need for the attendants did not result from the application of a remedy or prescription by a physician. He refused to consider Paul's contentions that because Ohio Casualty had made the attendant care payments for such an extended period of time that it should be estopped from now arguing that it had no duty to make those payments. The judge was of the opinion that "[o]ne cannot be estopped in such a way that the legislative policy here is to be expanded or modified."[4]
On this appeal Paul argues that full-time professional attendants and the health care coordinator qualify as "medical expenses" as defined by N.J.S.A. 39:6A-2e. The Public Advocate has submitted an amicus curiae brief in which he points out that rehabilitation is defined in other New Jersey statutes to include attendant care and a health care coordinator, and that therefore the No-Fault Law should be construed so as to include them. He further argues that the concept of least restrictive alternative care requires the coordinator and attendants in Paul's home; and that federal law which includes attendant care as part of rehabilitation provides a policy imperative to a similar construction of our No-Fault Law.
We find it unnecessary to specifically address the issues raised by the amicus curiae brief because we are satisfied that the No-Fault Law and the definition of "medical expenses," as well as the policy and intent of the statute, provide an adequate basis for our determination. Essentially the single issue in this case is whether the care provided for Paul by the attendants and health care coordinator is compensable under the PIP provisions of the No-Fault Law.
The applicable PIP provisions of N.J.S.A. 39:6A-4 in effect at the time of the decision[5] by the trial judge, read in pertinent part as follows:

*295 Personal injury protection coverage, regardless of fault.
Every automobile liability insurance policy insuring an automobile as defined in this act against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, ... of an automobile shall provide additional coverage, as defined herein below, under provisions approved by the Commissioner of Insurance, for the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured ... who sustained bodily injury as a result of an accident involving an automobile.... "Additional coverage" means and includes:
a. Medical expense benefits. Payment of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident.
* * * * * * * *
The term "medical expenses" which appears in N.J.S.A. 39:6A-2e is defined as follows:[6]
e. "Medical expenses" means expenses for medical treatment, surgical treatment, dental treatment, professional nursing services, hospital expenses, rehabilitation services, X-ray and other diagnostic services, prosthetic devices, ambulance services, medication and other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and surgery . .., dentistry ..., psychology ..., or chiropractic... or by persons similarly licensed in other states and nations or any nonmedical remedial treatment rendered in accordance with a recognized religious method of healing. (Emphasis added.)
It can readily be seen that the definition of "medical expenses" is quite broad and all inclusive. It embraces a number of items, including "medical treatment," "rehabilitation services," and "other reasonable and necessary expenses" resulting from the treatment prescribed by persons licensed to practice medicine.
The undisputed testimony in this case was that the attendants assisted in rehabilitation services and that Paul needed 24 hour a day assistance to prevent hospitalization and serious medical problems. Attendant care was recommended by almost all of the doctors who examined Paul.
*296 We recently considered the term "medical treatment" in Squeo v. Comfort Control Corp., 194 N.J. Super. 366 (App.Div. 1984), which involved an interpretation of that term under the workers' compensation laws. In Squeo the petitioner was a 25 year old quadriplegic who was or had been suicidally depressed. He wanted to live in his own apartment in order to attain a measure of independence and self-respect. The workers' compensation judge authorized construction of an addition to his parent's home. In analyzing the term "medical treatment" in the Workers' Compensation Act under N.J.S.A. 34:15-15 and concluding that this remedy was authorized, we said:
The injury here goes beyond the paralysis of petitioner's limbs. The compensation judge found that petitioner suffers from a severe mental depression caused by the accident that can be relieved to a significant degree by releasing him from the confines of the nursing home to private living quarters, designed to accommodate his physical handicap, where he can reassert a measure of independence more precious to him than life itself.
* * * * * * * *
Respondent argues that the "treatment" contemplated by the statute is limited to "medical services" and "appliances," terms used in N.J.S.A. 34:15-15 to describe the kinds of expenses which may be allowed. Medical treatment is given to preserve life and relieve the patient as much as possible from pain and disability whether physical or mental. The Workers' Compensation Act has always been liberally construed "to alleviate consequences of personal injuries caused by employment and to effect a measure of economic security for the workman so injured and to place the burden thereof on industry." Gargiulo v. Gargiulo, 13 N.J. 8, 13 (1953). See also Howard v. Harwood's Restaurant Co., 25 N.J. 72, 88 (1957). We do not suggest that employers must furnish injured workers whatever may bring material comfort to their lives. But where there is credible medical evidence that furnishing an injured worker his own living quarters is necessary to save his life, the definition of "treatment" is broad enough to encompass that relief. [Squeo, supra (194 N.J. Super. at 369).]
We consider the reasoning in Squeo persuasive here for several reasons. The legislature and the courts have directed a liberal construction to effect the beneficial purposes of both the No-Fault Law, see N.J.S.A. 39:6A-16; Gambino v. Royal Globe Ins. Co., 86 N.J. 100, 107-108 (1981); Vicari v. Nationwide Insurance, 174 N.J. Super. 463, 468 (App.Div. 1980), certif. den. 85 N.J. 464 (1980); Brokenbaugh v. New Jersey Mfrs. Ins. Co., 158 N.J. Super. 424, 429 (App.Div. 1978), and the *297 Workers' Compensation Law, see Torres v. Trenton Times Newspaper, 64 N.J. 458, 461 (1974); Squeo v. Comfort Control Corp., supra and Salierno v. Micro Stamping Co., 136 N.J. Super. 172, 175 (App.Div. 1975), aff'd, 72 N.J. 205 (1977). Additionally, the term "medical treatment" is used in both statutes. Our reasoning in Squeo and the broad construction there of that term applies to the terms "medical expenses" and "medical treatment" used in the No-Fault Law. Although we recognize that the No-Fault Law and the Workers' Compensation Law deal with different areas, both statutes are no-fault systems, and it is reasonable to interpret them in a similar manner when like issues are involved. Van Marter v. American Fidelity Fire Ins. Co., 114 Mich. App. 171, 178, 318 N.W.2d 679, 682 (1982), citing Visconti v. Detroit Automobile Inter-Insurance Exchange, 90 Mich. App. 477, 482, 282 N.W.2d 360, 363 (1979). Indeed, Ohio Casualty's brief relies on a workers' compensation case in support of its position, e.g., Coates v. Warren Hotel, 18 N.J. Misc. 122, 11 A.2d 436 (Compensation Bureau 1940), mod., 18 N.J. Misc. 363, 13 A.2d 787 (Cty.Ct. 1940).
The plaintiffs in this case and in Squeo were each quadriplegics who were depressed and potentially suicidal. Here, Paul's psychologist testified that he was suicidal in ideation and unduly enmeshed with his parents. Paul's physician testified that it would be devastating for him to be institutionalized. It is clear that Paul needs his apartment and the services and care provided by the coordinator and attendants. Ohio Casualty properly assisted in making arrangements for that apartment. We are satisfied that Paul's attendants and the coordinator qualify as part of his psychiatric care, and as such constitute proper "medical expenses." They also qualify as "other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and ... psychology." N.J.S.A. 39:6A-2e.
Furthermore, the attendants provided for Paul may be considered a part of Paul's on-going "medical treatment" in that they carry out various therapies at the behest of licensed *298 professionals  the speech therapist and the physical therapist. Although such therapies do not occupy all of their time, such activities as feeding, bathing and bandaging, while not separately prescribed by a doctor on each occasion, are obviously medically necessary to his existence. Similar services would have to be performed if Paul had been hospitalized. There would then have been no question of their being a proper charge as a "medical expense."
The trial judge had concluded that the attendants were not "prescribed" by a physician.[7] We disagree. Where the testimony and the opinions in the record clearly establish that the attendants were necessary, and even recommended, there is no need for a formal written prescription. The record establishes that Paul could not survive without constant attention. Due to his condition he would be unable to summon help, if needed, or to even physically push a call button for a nurse. In our view, the care rendered here by the attendants and the function of the coordinator, even if we did not consider the more routine aspects of the care, medical treatment or rehabilitation services, qualifies as "other reasonable and necessary services." We are of the opinion that the statute does not require a specific written prescription such as is given for medication. The term "prescribed" means and refers to what is authorized or recommended by those in the class of persons referred to in N.J.S.A. 39:6A-2e and which is reasonable and necessary to the treatment of the injured person. Here, the medical reports document *299 the necessity of the personnel and treatments. Even the consultant retained by Ohio Casualty or its reinsurer recognized in his reports the need for attendants, and even recommended them. Such recommendations including those in the reports written by Dr. Sahgal, viewed expansively, satisfy the "prescribed" requirement of the statute. Hence, the judge erred as a matter of law in his restrictive construction of the statute with respect to the services of the attendants and the coordinator.
We conclude that the attendants and coordinator qualify as eligible "medical expenses" under the PIP statute as "medical treatment," "rehabilitation services" and "other prescribed reasonable and necessary expenses resulting from the treatment prescribed" for his maintenance and survival.
We reverse and remand for entry of judgment in favor of plaintiff in accordance with this opinion.
NOTES
[1] Declaratory judgment actions seeking interpretation of statutes and insurance policies involve primarily legal rights and properly belong in the Law Division. See Government Employees Ins. Co. v. Butler, 128 N.J. Super. 492, 495-496 (Ch.Div. 1974).
[2] The date of this report may be in error because the examination report is attached in the appendix to a letter report dated February 17, 1982.
[3] As previously noted Ohio Casualty originally disputed the need for a physical therapist, speech therapist and psychologist. There was no appeal from the trial judge's determination that they were necessary and within the PIP coverage.
[4] We find it unnecessary to address the estoppel argument.
[5] N.J.S.A. 39:6A-4 was amended by L. 1983, c. 362, § 7, effective October 4, 1983. These amendments do not affect our determination here.
[6] Subparagraph e. was amended effective October 4, 1983 by L. 1983, c. 362, § 6, changing the phrase "hospital services" to "hospital expenses." That change has no bearing on our determination.
[7] The trial judge had no doubt that the attendant care was "appropriate," but he considered that these services were not encompassed within N.J.S.A. 39:6A-2e because he analogized the function of the attendants to optional types of entertainment which plaintiff could choose to forego. We do not consider such an analogy appropriate because the alternative is essentially institutionalization. A single live-in person who would be willing and able to devote constant attention to Paul would probably not only be difficult to find, but impractical. The record established that such an alternative was not realistic because of Paul's constant needs, his inability to move his body, the difficulty in communicating with him and the stress and demands it put on the attending person.