655 A.2d 99

ANGELA PERUN, PLAINTIFF, v. UTICA MUTUAL INSURANCE COMPANY, DEFENDANT.

Superior Court of New Jersey
Law Division Union County

Decided September 13, 1994.

---

[10] Final Judgment of Divorce, October 3, 1993, Vogelson, J.S.C.

*Catherine K. White,* for plaintiff.

*James W. Taylor, Jr.,* for defendant (*Lamb, Hartung, Kretzer, Reinman & DePascale,* attorneys).

SACHAR, J.S.C.

Angela Perun (Perun or plaintiff) brought suit against her PIP carrier for unpaid chiropractic bills and a declaratory judgment action for payment of an annual contract for weekly chiropractic maintenance, referred to as a "wellness program." Based on a review of the facts of this case and the controlling case law of the State of New Jersey, her claims are denied.

Plaintiff was injured in an automobile accident on July 18, 1986. Following the accident, she went to the emergency room. While x-rays of the cervical spine were negative for fracture, they showed marked degenerative changes at C4–5 and C5–6 and more moderate changes at C3–4.

Perun then saw Dr. Winell, an orthopedist, from July 24, 1986 through September 12, 1986, where she was treated for acute

cervical strain and contusion to the chest wall. An MRI of the cervical spine did not show a herniated disc but did demonstrate degenerative osteoarthritis. Her treatment consisted of bed rest and a course of physical therapy for ultrasound, electrical stimulation and range of motion exercises. She had physical therapy twenty-three times between July 24, 1986 and October 17, 1986. While plaintiff initially improved, she later complained that she was not any better and stated she had tingling and numbness in both arms and that the pain was no longer in her neck, but across her lower thorax posterially. As Dr. Winell concluded that she had plateaued orthopedically and was not improving, he referred her to a neurosurgeon for evaluation. She did not return to Dr. Winell and did not follow up with his referral.

Perun's next medical treatment, after a hiatus of approximately eight months, was to a different orthopaedic surgeon, Dr. Michael Bercik. She saw him on June 8, June 22, July 1, August 5 and September 22, 1987, when she was initially discharged from treatment. She was treated with rest, medicine and physical therapy. Her physical therapy lasted for a few months. Perun testified that the physical therapy only offered her relief for a few hours, and that her physical therapy was an exercise in futility.

Perun did not return to Dr. Bercik but started treatment approximately seven months later with Dr. Joseph Frasco, a chiropractor, on October 1, 1988. During the course of treatment with the chiropractor she returned to Dr. Bercik on March 7, 1988, for a reevaluation, but continued treatment with the chiropractor. The PIP carrier paid the chiropractic bills through February 1991, but not since then. Dr. Frasco initially saw her two to three times a week. He then saw her with less frequency, approximately twice a month. There were periods of time when she did not go at all. She had no treatment from November 21, 1990 to January 24, 1991. She went four times from November 9, 1990 to February 1991. Her schedule was erratic in March 1991. There was no treatment from October 12, 1991 to August 16, 1992. There was

no treatment from March 1993 to January 1994. He treated her forty-four times and the charges totalled $2,075.

The initial treatment on October 1, 1988, consisted of spinal adjustment and ineterferential therapy. Rehabilitative exercises were then recommended and carried out after acute symptoms subsided to strengthen and support spinal structures.

Perun again returned to Dr. Bercik on March 18, 1994. He diagnosed her condition as (1) residual of cervical radiculitis and (2) residual of herniated lumbar disc. He found the conditions to be permanent and causally related to the accident of July 18, 1986. Dr. Bercik testified that she did not return. He prescribed anti-inflammatory medication and he testified that he would have put her on a tens unit for one month had she returned. After the one month, he would have recommended that the tens unit be purchased. When questioned with respect to the treatment plaintiff was receiving from the chiropractor, Dr. Bercik testified that it would take four to six weeks to recover from a flare-up of severe pain. Dr. Bercik did not find weekly chiropractic treatments to be necessary. While he never recommends chiropractic treatment, he opined that ten treatments a year would be the maximum for severe flare-ups. Nor did Dr. Bercik find that plaintiff's condition would deteriorate without treatment.

Perun testified that she had taken the prescribed medication from Dr. Bercik on one occasion, but discontinued it. She lost no time from work but in the past had used a cane on occasion, and had also carried two individual brief cases, one in each hand, instead of one heavy briefcase, to avoid pain.

As of May 1994, she entered into an annual wellness contract with the chiropractor to be seen weekly. The cost is $1,020 which is said to be half the annual fee for weekly visits. Perun testified that the maintenance program prevents her from having the pain that she had previously been subject to and that the treatments make her feel better.

It is clear that Perun was receiving more frequent therapy from when she was cut off at the end of February 1991, almost four and one-half years post-accident and continuing through until the time of the trial on June 2, 1994, which is almost eight years post-accident, than she received during the initial one and one-half years of the accident when she saw Dr. Winell and/or Dr. Bercik. She has lost no time from work. Since the doctor's testimony and reports indicate some improvement, one would expect the injuries sustained to have led to either reduced or a cessation of treatment. In fact, it has been continuing on a regular basis and there is every indication that it will so continue throughout plaintiff's lifetime. Weekly visits under the wellness contract of 52 weeks, when contrasted with the ten maximum that are necessary according to Dr. Bercik, shows the treatment to be grossly excessive.

Even before the wellness contract, the periodic and sometimes extended periods of absence from chiropractic care were occasioned by plaintiff's schedules that were unrelated to her physical condition.

According to chiropractor Frasco, the wellness program is a general maintenance program available to all persons who come to him, as most people suffer trauma of some sort in their life and benefit from such a program. The court finds that the treatment undertaken primarily addresses a general aging condition of plaintiff. The court finds no functional disabilities that prevent Perun from the active pursuit of her profession. The court further finds that Perun's condition is not subject to deterioration without treatment, nor is her chiropractic treatment an alternative to an operation. The fact that one may temporarily feel better from continued chiropractic treatment, which includes massage, does not make the treatment necessary. In this case, the wellness program is a matter of personal choice for plaintiff's comfort, convenience and general feeling of well being.

Palliative medical care affords a temporary relief from pain only. It does not effect a cure or rehabilitation. After treatment to effectuate a cure or rehabilitation has ended and a

patient's condition has plateaued, medical expenses for palliative treatment may continue, but only to the extent that such expenses are deemed reasonable and necessary.

As may be seen from the cases that follow, the fact that pain continues as a result of a permanent injury does not invariably make such costs "reasonable" or "necessary" medical expenses. The reasonableness and the necessity of palliative expenses must be evaluated in the context of the quantum of pain involved, plaintiff's tolerance of pain, and the overall effect of the pain on plaintiff's life. Each PIP case must be examined on its own facts in light of the foregoing variables. "The services must be shown by competent medical testimony to be such as are reasonable and necessary for the particular patient, taking into consideration his individual condition and need." *Howard v. Harwood's Rest. Co.,* 25 *N.J.* 72, 93, 135 *A.2d* 161 (1957) (cited with approval in *Squeo v. Comfort Control Corp.,* 99 *N.J.* 588, 599, 494 *A.2d* 313 (1985) (a worker's compensation case)). In *Squeo,* the Court stated, "[w]e stress that in determining what is reasonable and necessary, the touchstone is not the injured worker's desires or what he thinks to be most beneficial. Rather, it is what is shown by sufficient competent evidence to be reasonable and necessary to cure and relieve him." *Id.* at 606, 494 *A.2d* 313.

"To satisfy the requisite as to whether the medical expense incurred was 'necessary,' one must examine the *need* for the treatment." Mario Iavicoli, *No–Fault and Comparative Negligence,* (1st ed. 1973) at 46. If such needs were not taken into account, the allowance of medical expenses without regard to cost effectiveness would subvert one of the purposes of the no-fault statute. As indicated by the Court in *Roig v. Kelsey,* 135 *N.J.* 500, 506, 641 *A.2d* 248 (1994) (quoting *Emmer v. Merin,* 233 *N.J.Super.* 568, 573, 559 *A.2d* 845, *certif. denied,* 118 *N.J.* 181, 570 *A.2d* 950 (1989)), "[d]espite the 1983 amendments the cost of automobile insurance 'continued to spiral, however, resulting in New Jersey's near lead position in the unenviable category of

having the highest automobile insurance premiums in the country.' "

The Court in *Fitzgerald v. Wright,* 155 *N.J.Super.* 494, 382 *A.*2d 1162 (App.Div.1978), stated:

It is manifest that the purpose and design of the no fault law are to curtail litigation in the area of automobile personal injury claims by providing a system, of personal injury protection regardless of fault. This system, in turn, was intended to furnish expeditious and inexpensive compensation to an injured person for his economic losses within certain limitations and also to reduce the ever increasing premium rates for automobile liability insurance.

[*Id.* at 497–98, 382 *A.*2d 1162.]

The word "necessary" has been similarly defined under both the worker's compensation and the PIP statutes. Therefore, both compensation and PIP cases are relevant with respect to an interpretation of necessary medical expenses, as well as the type of maintenance programs that the courts have considered to fall within the ambit of being necessary medical treatment.

The worker's compensation statute defines "[m]edical and hospital service" as:

The employer shall furnish to the injured worker such medical, surgical and other treatment, and hospital service as shall be necessary to *cure and relieve* the worker of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible. . . .

[*N.J.S.A.* 34:15–15 (emphasis added).]

In interpreting the change in the statute to the "cure and relieve" language incorporated in the worker's compensation statute, the Court in *Howard, supra,* held that:

We find that the purpose of deleting the adjective "unusual" and substituting in its stead the language "cure and relieve" was to make explicit what had under the 1919 act only been implied, i.e., that a workman was entitled to benefits for medical services, hospital services, or treatment which would afford relief from the sufferings incident to an accident arising out of his employment, whether or not a cure might at the same time be effectuated.

[25 *N.J.* at 91, 135 *A.*2d 161.]

As stated by the Appellate Division in *Paul v. Ohio Cas. Ins. Co.,* 196 *N.J.Super.* 286, 482 *A.*2d 199 (App.Div.1984) (a PIP case), when dealing with medical expenses in the worker's compensation statute and the medical treatment used in the no-fault law, "both statutes are no-fault systems, and it is reasonable to interpret

them in a similar manner when like issues are involved." *Id.* at 297, 482 *A.2d* 199.[1]

The PIP benefits provided for in the New Jersey Reparation Reform Act (*N.J.S.A.* 39:6A–1 to –35) contained in *N.J.S.A.* 39:6A–2e, reads as follows:

Medical expenses means expenses for medical treatment, surgical treatment, dental treatment, professional nursing services, hospital services, rehabilitation services, x-ray and other diagnostic services, medication and *other reasonable and necessary expenses* resulting from the treatment prescribed by persons licensed to practice medicine and surgery, pursuant to R.S. 45:9–1 *et seq.* Dentistry, pursuant to R.S. 45:6–1, *et seq.,* psychology pursuant to P.L. 1966 *c.* 282 C. 45:14B–1, *et seq.* or chiropractic pursuant to P.L. 1953 *c.* 233 (C. 45:9–41.1 *et seq.*) or by persons similarly licensed in other states or nations or any non-medical remedial treatment rendered in accordance with a recognized religious method of healing.

[Emphasis added.]

In *Howard, supra,* the plaintiff became totally and permanently disabled as a result of an attack upon her pursuant to an attempt to rob the employer, and was confined to a nursing home where she received nursing and palliative physiotherapy treatment. In approving of palliative treatment, as distinguished from curative treatment alone, the Court stated that:

We therefore find that the intendment of the 1919 amendment was to supply medical and surgical treatment to injured employees which did not of necessity result in cure, but which might afford some measure of relief from the effects of such injury.

[*Howard, supra,* 25 *N.J.* at 90, 135 *A.2d* 161.]

The Court further stated:

The effect given the statute by appellant's construction is that *in those cases* where the injury arising out of the employment is most serious, i.e., where the *workman is totally and permanently disabled and without hope of cure,* the employer's duty to render medical care and treatment ceases.

Thus, in a situation where the injury results in an incurable cancerous condition the employer is not obligated to defray the cost of medical treatment which might ease or mitigate the pain and suffering of the employee, and the employee is left to his own economic resources in acquiring such care as he may be able to afford. We will not, in the absence of a clear legislative intent to the contrary, condone an interpretation of the act so discordant with its benevolent purposes.

[*Id.* at 88, 135 *A.2d* 161 (emphasis added).]

---

[1] See also to the same effect *Paul v. Ohio Cas. Inc. Co.,* 216 *N.J.Super.* 250, 523 *A.2d* 663 (App.Div.1987) (*Paul II* ) (affirming order of payment after remand).

In *Squeo, supra* (a worker's compensation case), the Appellate Division stated that the housing provided was medical treatment:

We do not suggest that employers must furnish injured workers whatever may bring material comfort to their lives. But where there is credible medical evidence that furnishing an injured worker his own living quarters is necessary *to save his life*, the definition of "treatment" is broad enough to encompass that relief.

[194 *N.J.Super.* at 370, 494 *A.*2d 313 (emphasis added).]

*Paul, supra*, dealt with physical therapy for a quadriplegic to prevent deterioration of the muscles and muscular atrophy which was deemed essential to maintaining a hope of recovery if a cure was found. With respect to attendant care and the services of a coordinator, the court stated:

We are satisfied that Paul's attendants and the coordinator qualify as part of his psychiatric care, and as such constitute proper "medical expenses."

[196 *N.J.Super.* at 297, 482 *A.*2d 199.]

The record establishes that Paul *could not survive* without constant attention.

[*Id.* at 298, 482 *A.*2d 199 (emphasis added).]

Furthermore, the attendants provided for Paul may be considered a part of Paul's on-going "medical treatment" in that they carry out various therapies at the behest of licensed professionals—the speech therapist and the physical therapist. Although such therapies do not occupy all of their time, such activities as feeding, bathing and bandaging, while not separately prescribed by a doctor on each occasion, are obviously medically *necessary to his existence*. Similar services would have to be performed if Paul had been hospitalized. There would then have been no question of their being a proper charge as a "medical expense."

[*Id.* at 297–98, 482 *A.*2d 199 (emphasis added).]

*Stewart by Stewart v. Allstate Ins. Co.*, 103 *N.J.* 139, 510 *A.*2d 1131 (1986) (a PIP case), dealt with the cost of a van for a quadriplegic. The trial court concluded:

[I]f the expenses are incurred simply for comfort, convenience, or other purely personal reasons, they do not meet the statutory definition of "medical expenses"; but "if they bear a reasonable relationship to a significant therapeutic benefit for a mental or physical disability and are prescribed by a doctor, they constitute medical expenses."

[*Id.* at 143, 510 *A.*2d 1131.]

The trial court further found that:

Her curricular and extracurricular activities were prescribed by her doctors as therapy and the modified van and orthopedic lift chair are needed not for pleasure

or comfort but "for her emotional and physical well being." They are a *sine qua non* for her rehabilitation.

[*Ibid.* (emphasis added).]

## Our Supreme Court held that:

On the basis of this record, consisting as it does of undisputed medical testimony to the effect that the van is *indispensable* to plaintiff's physical and emotional well-being, the basic cost of the vehicle is surely a "reasonable and necessary expense[ ] resulting from the treatment prescribed" by the treating physicians. See *N.J.S.A.* 39:6A–2(e). The "treatment" is the activity—here, in the words of Dr. Bid, the "continuation of [Pamela's] independence and all of her curricular and extracurricular activities."

[*Ibid.* (emphasis added).]

In *Elkins v. New Jersey Mfrs. Ins. Co.,* 244 *N.J.Super.* 695, 583 A.2d 409 (App.Div.1990) (a PIP case), the Appellate Division affirmed the trial court's denial of palliative maintenance costs for therapy to the neck of a woman who suffered a serious eye injury, where home treatment was an adequate alternative.

Parenthetically, we do note that plaintiff obviously could not get the equivalent of chiropractic adjustments through such home treatments. However, there was no evidence produced that this particular professional treatment was any more beneficial in relieving her pain than the treatment modalities she could have utilized at home. Therefore, the trial court correctly concluded that the chiropractic care rendered by Dr. Picone was "grossly excessive and repetitious" and therefore, was unnecessary and unreasonable.

[*Elkins,* 244 *N.J.Super.* at 703, 583 A.2d 409.]

*Elkins* involved an accident on November 4, 1982, resulting in plaintiff sustaining a perforating injury to the cornea of her left eye and lens inside the eye resulting in a loss of vision in her left eye. The palliative treatment was for chiropractic treatment to her neck. The chiropractor treated her for a period of over seven years. The neck pain resulted from the difficulties she had in positioning her neck as a result of the loss of vision in her eye.

Plaintiff has no peripheral vision and she assertedly drives with one eye closed because of sensitivity to light, thereby requiring her to constantly turn her neck and body. She has two sons and is frequently required to drive her younger son to his many activities. She attends to her household bills and owns a tennis pro shop which requires her to engage in extensive office duties. Performance of these various duties results in neck pain, due to the constant need to lean over to read, etc.

. . . .

[The chiropractor] corroborated that plaintiff has no scheduled or standing appointment but calls him if she is in pain. Dr. Picone confirmed that her pain is exacerbated by driving, physical exertion and paperwork. In fact, when reading plaintiff is forced to keep one eye "severely tightly" closed to avoid double vision which in turn, causes spasms in her neck and scalp muscles. Moreover, her restricted field of vision requires her to turn her head at severe angles, thereby causing extensive strain on her musculature.

. . . .

[P]laintiff's lack of proper peripheral vision requires her to constantly turn her head. Therefore, [it was the ophthalmologist's opinion] that chiropractic treatments are necessary and beneficial to relieve the consequent strain in her muscular system.

[*Id.* at 696–98, 583 *A.*2d 409.]

Notwithstanding the court's finding "that the only permanent 'cure' available was for plaintiff to undergo a risky corneal transplant." *Id.* at 700, 583 *A.*2d 409, the Appellate Division sustained the trial court's denial of medical expenses based on the trial court's finding that the chiropractor:

made no effort to wean her from his care and likewise there was no attempt to have her substitute effective home remedies. The trial judge found totally credible Dr. Barile's testimony that the chiropractic treatment then being rendered was ineffective and of no therapeutic value and that the same benefits could be achieved by home care. Therefore, he concluded that such chiropractic treatments were "grossly excessive and repetitious."

[*Id.* at 702, 583 *A.*2d 409.]

The appellate court accordingly found that the expenses were neither necessary nor reasonable within the PIP requirements of the No–Fault Act, *N.J.S.A.* 39:6A–4a. *Id.* at 703, 583 *A.*2d 409.

The Court's interpretation of what are reasonable and necessary expenses is not static, but varies according to the relief sought. To qualify for housing and the like, there need be extraordinary disability. The Supreme Court in *Squeo* in approving housing for a quadriplegic cautioned, "that it is only the unusual case that may warrant such extraordinary relief." *Squeo, supra,* 99 *N.J.* at 604, 494 *A.*2d 313. The Court cited *Peace River Elec. Corp. v. Choate,* 417 *So.*2d 831, 832 (Fla.Dist.Ct.App.1982), which stated, "[a]gain, we caution that only extreme cases of disability might warrant such extraordinary relief." The Court made clear that even under a liberal construction of the statute, "[t]his relief, however, has

been allowed only after a determination that such expenses are 'reasonable and necessary' to relieve the injured worker of the effects of his injuries." *Squeo, supra,* 99 *N.J.* at 603, 494 *A.2d* 313. In contrast are cases like *Miskofsky v. Ohio Cas. Ins. Co.,* 203 *N.J.Super.* 400, 497 *A.2d* 223 (Law Div.1984), overruled on other grounds in *Simon v. CNA Ins. Co.,* 225 *N.J.Super.* 606, 543 *A.2d* 110 (App.Div.1988), *certif. denied* 113 *N.J.* 350, 550 *A.2d* 461 (1988), where the criteria is less demanding.

> In *Miskofsky,* the plaintiff suffered soft tissue injuries to her neck, shoulders, knee and elbow. She was initially treated with physical therapy twice a week for approximately eight months and then less frequently, and ultimately ceased physical therapy completely some 15 months after the accident. During that time frame, plaintiff was treated by an orthopedic specialist who sent her for physical therapy treatments on an "as needed" basis.
>
> [*Elkins, supra,* 244 *N.J.Super.* at 701, 583 *A.2d* 409 (citing *Miskofsky*).]

Under those factual circumstances, the trial judge in *Miskofsky* found the diagnostic and palliative expenses to be reasonable and necessary.

Justice Pollock stated in *Frame v. Kothari,* 115 *N.J.* 638, 649, 560 *A.2d* 675 (1989), "[w]henever a court draws lines, it risks the criticism of arbitrariness. Drawing lines, however, is the business of the courts and lines must be drawn to provide remedies for wrongs without exposing wrongdoers to unlimited liability."

While ongoing maintenance expenses do not constitute necessary medical treatment in the case at bar, periodic expenses for the relief of pain could still constitute necessary treatment. A case dealing with medical services "reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible" was interpreted as constituting necessary medical services in *Group Hosp., Inc. v. Levin,* 305 *A.2d* 248, 250 (D.C.App.1973). In approving private nursing expenses for approximately one month following the surgical removal of a ruptured intervertebral disc, the court stated:

> The evidence disclosed ... that she was in severe pain and under constant medication to alleviate her suffering. Moreover, she was unable to turn herself in bed. Nor could she feed herself or perform other normal bodily functions without assistance. The attending surgeon conceded in his testimony that not all disk

patients in the postoperative stage need private nurses, but averred that most of those with comparable pain did require such services. He stated that his patient was suffering as much pain as he had ever seen in a postoperative case and reiterated several times his opinion that private nurses were medically necessary.

[*Levin, supra,* 305 *A.*2d at 249–50.]

However, the court made clear that the expense of private nurses would not be provided:

merely to alleviate discomfort or to provide the patient with the companionship and convenience of a special nurse. This court is not unmindful of the rising costs of medical insurance and recognizes that unless the term "necessary medical services" is given a literal meaning, the availability of insurance for private nurses could be abused by patients and oversolicitous physicians to the point of destroying the actuarial basis of current premium rates. In the instant case, had the carrier disallowed only those nursing expenses incurred after the immediate postsurgical exigency at a time when convalescence had progressed to the point that the vigil of a private nurse was no longer essential, such action might well have been justified.

[*Id.* at 250–51.]

Even when private nursing was no longer necessary, Levin would have been left with the alternative care of the general nursing staff to ameliorate her pain.

 Expenses for the relief of a painful flare-up may be necessary treatment where the very nature of the injury requires periodic attention. In *Di Giorgio Fruit Corp. v. Pittman,* 49 *So.*2d 600 (Fla.1950), the claimant suffered from chronic thrombophlebitis as the result of an accident. The court found that "[t]he nature of this ailment is such that a flare-up occurs every two or three months . . ." *Id.* at 603. The court accordingly found that:

"[T]he nature of the injury" requires that we construe the words "as may be necessary to effect a recovery" to mean a recovery from the attacks which are brought about as the result of thrombophlebitis. . . . It cannot be said that he has recovered from the injury so long as painful and potentially dangerous attacks directly attributable to, and consequent upon, the injury recur. Particularly is this true when the evidence discloses the fact that medication alleviates the pain and suffering—"the effects of the injury"—and without medical attention any one of such attacks might result in the death of the Claimant. It is clear that medical attention is required periodically in order to keep the condition attendant upon thrombophlebitis "under control."

[*Ibid.*]

In this case there was no testimony before the court indicating what, if any, unpaid treatment by the chiropractor was incurred

for an actual flare-up, much less what the nature of such a flare-up consisted of. It may be assumed that there have been no flare-ups since she has embarked on the wellness program.

Further, alternative treatment not necessitating the cost of continued chiropractic care was recommended by Dr. Bercik, namely a tens unit that presumably would alleviate her pain. Having placed herself under the treatment of Dr. Bercik and continuing to return to his office, the court finds Perun unjustified in failing to follow his advice.

The court finds that: (1) there was no evidence provided of what expenses, if any, were incurred for the relief of significant pain and/or disability resulting from a flare-up; (2) plaintiff did not follow Dr. Bercik's treatment recommendations but disregarded the medication prescribed and did not avail herself of a tens unit; and (3) the ongoing chiropractic treatments are disproportionately expensive, excessive and in large part for Perun's personal comfort.[2] The PIP carrier has paid bills for approximately five years following the accident. With respect to bills for an additional three plus years thereafter, the court finds that plaintiff has failed to sustain her burden of proof that these additional expenses for chiropractic treatment were necessary.

---

[2] It should be noted that Perun settled her third party action so that notwithstanding the fact that payments of medical expenses are not being allowed to totally eliminate all pain, she undoubtedly has received monies in the tort action for pain and suffering. See *Roig v. Kelsey, supra,* 135 *N.J.* at 18, 641 A.2d 248 (quoting *Lattimer v. Boucher,* 189 *N.J.Super.* 33, 38, 458 A.2d 528 (Law Div.1983) (stating that New Jersey strongly disapproves of double recovery by accident victims)); *Bernick v. Aetna Life & Casualty,* 158 *N.J.Super.* 574, 582, 386 A.2d 908 (Cty.Ct.1978) (stating same).