EUGENE M. SQUEO, PETITIONER-RESPONDENT, v. COMFORT CONTROL CORP., RESPONDENT-APPELLANT.

Argued March 18, 1985—Decided July 3, 1985.

*Patrick J. McAuley* argued the cause for appellant (*Connell, Foley & Geiser,* attorneys, *George J. Kenny,* of counsel).

*Eugene P. Squeo* argued the cause for respondent (*Schiller, Vyzas, McGill & Squeo,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The primary issue in this workers' compensation case is whether the construction of a self-contained apartment attached to the home of an injured worker's parents may constitute "medical, surgical or other treatment ... necessary to cure and relieve" or "other appliance" under *N.J.S.A.* 34:15-15 of the Workers' Compensation Act (Act); and if so, whether there is sufficient credible evidence in the record to support the finding that the construction of the apartment addition was necessary and that its cost was reasonable.

The petitioner, Eugene M. Squeo (Squeo), is a quadriplegic. He was injured in 1978 when he fell from a roof while working for respondent, Comfort Control Corp. (Comfort Control). He is totally and permanently disabled. In 1979, a judgment ordering disability payments was entered by a judge of the Division of Workers' Compensation.

In February, 1982, Squeo filed an Application for Review or Modification of Formal Award seeking, *inter alia,* an order requiring Comfort Control to construct a self-contained apartment attached to the home of his parents. The compensation court ordered that such construction be undertaken. The Appellate Division affirmed the Order of the compensation court 194 *N.J.Super.* 366. We granted Comfort Control's petition for certification. 99 *N.J.* 148 (1984).

I

Squeo was 24 years old at the time of his accident in 1978. He is a wheelchair-bound quadriplegic. The compensation court concluded that his disability was orthopedic, neurologic, and neuropsychiatric involving residuals of multiple injuries including severance of the spinal cord. Dr. Richard Sullivan, Medical Director of the Kessler Institute of Rehabilitation, treated Squeo for several months. A witness on behalf of Comfort Control at the hearing, he testified that Squeo "had a terribly physical post injury course." Usually after about eight weeks a quadriplegic is "well, though disabled;" in contrast, Squeo was "unwell for probably about two, two and a half years after his injury." Dr. Sullivan attributed Squeo's emotional problems to his protracted physical ailments. He testified that Squeo

has had a terribly hard time. The man has had just about every complication that God ever put on this earth for him. Quadriplegic, the first year was devastating at the Veteran's Hospital and Hackensack because he went out of one problem into another and then when we saw him, immediately we had to do something to his urinary tract and surgery and then he came back and we had problems with skin breakdowns, rashes, you name the complications, this poor fellow had it. Then he developed a curvature of the spine and we had to send him for corrective surgery to the spine and this was completed, and as I say he's had one medical difficulty after another.

For several years prior to his injury, Squeo had lived independently of his parents. Since 1980, he has been confined to a nursing home with predominantly elderly patients. The institutional living and the nursing home environment caused Squeo to become severely depressed. His depression was so great

that on three occasions, while in the nursing home, he attempted suicide.

Because of the oppressive, institutional atmosphere that pervaded the nursing home, Squeo requested a modification of his disability award. Squeo testified at the compensation hearing that he wanted to "get on with life" which he "ha[d] not done in the last four years." He wanted to attend college and thereafter become gainfully employed. In order to do so, he felt it was necessary to be removed from the nursing home and "be rehabilitated into the world as a functional person again." He believed that the best way for him to be so rehabilitated was to live in a separate studio apartment attached to his parents' home.

At the compensation hearing Dr. Peter Crain, an expert in neurology and neuropsychiatry, testified on Squeo's behalf. Having examined Squeo, he diagnosed his condition as depression with suicidal tendencies. He explained that Squeo had developed ways of adjusting to his quadriplegia and had aspirations of attending college and thereafter being employed. The doctor opined that Squeo's depression was caused by the conflict between his ambitions and his perception of his future in the nursing home with older people with whom he had nothing in common. He resented being controlled by the institutionalized procedures of the nursing home.

Crain noted that Squeo had made three suicide attempts, which were rooted in his depression.

> He believed that since he's a young man, twenty-eight years old, to look forward to a life like this in the nursing home is no life at all and that he [sic] rather be dead than to have to live a life like this. Now, he admitted to me that the fact of carrying out suicide in itself is irrational but at those times when he particularly becomes frustrated, angry, upset, depressed, then his rationality goes out the window and all he can think about is how to do it, that's the only way to escape from this intolerable situation.

Crain opined that a change in Squeo's environment would have a beneficial effect on his depressed state, and that as long as he remained in the nursing home, there would be more suicide attempts.

Crain concluded that an addition to petitioner's parents' home, such as the one described by petitioner, would be the environment in which petitioner would function best, and having accomplished this, he "would feel much better." Crain did not think that government-provided living facilities designed especially for quadriplegics would be as beneficial to Squeo's well-being as the apartment addition to his parents' home inasmuch as "[h]e sees any institution as being an obstacle to his ability to function to his capability."

Squeo's next witness at the hearing was Deidra Davis, an expert in mainstreaming handicapped people back into society. She defined mainstreaming as allowing individuals with disabilities to participate as fully and completely as they can in all aspects of society. She emphasized the importance to a disabled person of independent living, a concept whereby the individual assumes total responsibility and direction for his or her own life.

Miss Davis testified that because nursing homes are geared primarily towards geriatric patients, they do not provide a psychological environment conducive to independent living for young patients like Squeo. Thus, to relegate a young man like Squeo to a nursing home would "shortchang[e] him of the life that he should have" and condemn him to "a fate worse, worse than death * * *." Squeo's ability to choose his own living environment was the "utmost important issue" for his physical and psychological health.

While government-provided facilities would be an improvement for Squeo over the nursing home environment, Miss Davis believed they would not be as beneficial to him as the apartment addition. The few independent living facilities established in this state are primarily occupied by the elderly and are more suited to those individuals who have been released from nursing homes and institutions and need a great deal of care. According to Miss Davis, such facilities are not as beneficial for

a person like Squeo, who, while in need of care, has a tremendous need to live as independently as possible.

Gordon Anthony, a quadriplegic and the executive director of Dial for Independent Living, also testified for petitioner. His organization helps disabled people to gain control over their own lifestyles and options. He testified that the disabled become angry, frustrated, and depressed by the lack of options available to them. Anthony stated that the best independent-living environment depends on the individual. Because Squeo reacted so strongly against the restrictions of institutional living, Anthony believed the nursing home was a terrible place for him.

Dr. Richard Sullivan, Medical Director of Kessler Institute of Rehabilitation, appeared as Comfort Control's main witness. He testified that in cases involving a quadriplegic, the usual practice at the Kessler Institute is a discussion between the employer or his insurance carrier and the patient about feasible housing plans for the patient. This practice was followed in this case. Dr. Sullivan spent a lot of time with Squeo's parents and his employer discussing plans to provide functional housing for Squeo. Among the alternatives considered were the conversion of the Squeos' basement to accommodate petitioner, a plan abandoned because the basement was considered to be too damp; a proposal to add a room and bath to the Squeos' house; and the attachment to their house of a mobile home, a plan unacceptable to the municipality. Unable to develop a feasible plan, Sullivan and Comfort Control advised the Squeos to meet with an architect to develop a plan. At that time, the Squeos were given a cost factor "that was compatible at that time with a room and bath addition to a home." He testified that the cost factor was based upon "the experience of the insurance company and ourselves as advisers in these conditions. We put many additions onto many homes for people."

Dr. Sullivan testified that the architect's recommendation surprised him. Instead of the usual addition of a room and

bath, with ingress to and egress from the home, the plan contemplated a separate apartment attached to the home. The apartment would contain a bedroom, kitchen, living room, bathroom, carport, basement, and hydraulic lift, and would require its own electricity, plumbing, and heating. The architect estimated the cost to be in excess of $65,000.

When questioned by the compensation judge, Dr. Sullivan conceded that the addition of the separate apartment "is not that bad an idea." However, he expressed concern about the cost of such an addition.

In its oral opinion the compensation court found there was "ample evidence to establish the reasonableness and necessity of the requested alteration." It found the construction of the separate apartment necessary for the relief of Squeo's condition, and directed the construction of an apartment addition comparable to a standard apartment used in one of this state's two independent-living facilities be constructed. It ordered that Squeo be charged with the cost of constructing any additions to the standard apartment and with the care, maintenance, capital repairs, insurance, and any taxation to be associated with the construction.

The Appellate Division affirmed the order of the compensation court, finding that Squeo's injuries went beyond the paralysis of his limbs. It found that he was suffering from a severe mental depression that, on three occasions, had brought him to the brink of suicide. Providing Squeo with independent living quarters would relieve his depression and perhaps save his life. Accordingly, the apartment addition constituted "treatment" within the purview of the Act.

> Medical treatment is given to preserve life and relieve the patient as much as possible from pain and disability whether physical or mental.
>
> [194 *N.J.Super.* at 369–70.]

Mindful of the cost of the apartment addition, the Appellate Division instructed that the "cost of the apartment not go beyond providing for petitioner's basic need for independent living quarters." *Id.* at 370. It ordered that the employer be

secured by a mortgage executed by Squeo's parents so that if Squeo should no longer use the apartment, the employer would be compensated for any significant value the apartment may add to the property in the event it is sold, rented, or mortgaged. *Id.* at 371.

## II

*N.J.S.A.* 34:15–15 in pertinent part provides:

The employer shall furnish to the injured worker such medical, surgical and *other treatment,* and hospital service *as shall be necessary to cure and relieve the worker of the effects of the injury* and to restore the functions of the injured member or organ where such restoration is possible; * * * the Division of Workers' Compensation after investigating the need of the same and giving the employer an opportunity to be heard, shall determine that such physicians' and surgeons' treatment and hospital services *are or were necessary and that the fees for the same are reasonable* and shall make an order requiring the employer to pay for or furnish the same.

   *        *        *        *        *        *        *        *

When an injured employee may be partially or wholly relieved of the effects of a permanent injury, by use of an artificial limb or *other appliance,* which phrase shall also include artificial teeth or glass eye, the Division of Workers' Compensation, *acting under competent medical advice, is empowered to determine the character and nature of such limb or appliance, and to require the employer or the employer's insurance carrier to furnish the same.*

[Emphasis added.]

Pursuant to *N.J.S.A.* 34:15–15, it is evident that an employer must provide an injured worker with "other treatment" or "other appliance" that serves to cure and relieve a worker of the effects of his work-connected injury. The employer contends, however, that "other treatment" or "appliance" under *N.J.S.A.* 34:15–15 is not intended to encompass the construction of a self-contained apartment.

There is no express legislative or judicial definition of these terms in New Jersey. However, it has long been recognized that the Act is remedial social legislation and as such is to be liberally construed so that its beneficent purposes may be accomplished. *Kahle v. Plochman, Inc.,* 85 *N.J.* 539, 547 (1981); *Panzio v. Continental Can Company,* 71 *N.J.* 298, 303

(1976); *Torres v. Trenton Times Newspaper*, 64 *N.J.* 458, 461 (1974); *Petrozzino v. Monroe Calculating Mach. Co., Inc.*, 47 *N.J.* 577, 580 (1966); *Howard v. Harwood's Restaurant Co.*, 25 *N.J.* 72, 88 (1957); *Gargiulo v. Gargiulo*, 13 *N.J.* 8, 13 (1953). "[O]ur courts have not hesitated in the past to construe the workmen's compensation act so as to comport with its presumptive beneficent and remedial objectives favorable to injured workmen rather than to be bound by its coldly literal import." *Paul v. Baltimore Upholstering Co.*, 66 *N.J.* 111, 136 (1974); *Close v. Kordulak Bros.*, 44 *N.J.* 589, 604 (1965). Such liberal construction in favor of the claimant accomplishes the statutory purposes of allocating the cost of work-connected injuries first to the industry, and ultimately to the consuming public through the cost of the employer's product. *Petrozzino, supra*, 47 *N.J.* at 580, *Garguilo, supra*, 13 *N.J.* at 13.

The expansion in coverage since the Act's inception, as evidenced by the legislative history of *N.J.S.A.* 34:15–15, supports a liberal interpretation of the Act.

When *N.J.S.A.* 34:15–15 was first enacted in 1911 it simply provided:

> During the first two weeks after the injury the employer shall furnish reasonable medical and hospital services and medicines, as and when needed, not to exceed one hundred dollars in value, unless the employe refuses to allow them to be furnished by the employer.
>
> [*L.* 1911, *c.* 95, § 14.]

The Act was amended in 1913, and again in 1919. The latter amendment extended recovery under the Act beyond medical and hospital services and medicines.

> [I]n severe cases requiring unusual medical or surgical treatment or calling for artificial limb or other mechanical appliances, the employee or his representative shall be authorized to present a petition to the Workmen's Compensation Bureau, and the Commissioner, deputy commissioner or referee thereof is hereby empowered, when warranted by the evidence produced, to order additional services, artificial limbs or other appliances not to exceed in total the sum of two hundred dollars, or to extend over a period not to exceed in total seventeen weeks. This paragraph shall apply only to nonfatal cases.
>
> [*L.*1919, *c.* 93, § 4]

In 1922, the statute was amended again and its coverage expanded. The 1922 amended statute, virtually identical to the present version, is especially pertinent to our analysis. The 1922 amendment removed the monetary limitation on benefits to be paid by the employer and authorized the Workmen's Compensation Bureau to allow such treatment or services as it found to be "necessary." [1] Moreover, the words "unusual medical surgical treatment" were omitted and in lieu thereof appeared the words "medical, surgical and *other treatment*, and hospital services as shall be necessary to cure and relieve the workman of the effects of the injury." (Emphasis added).

Similarly, the Statement of Purpose accompanying the 1922 amendment supports a liberal interpretation of *N.J.S.A.* 34:15-15:

> The purpose of this bill is to amend the provisions of the Workmen's Compensation Act so as to separate the charges for physicians' and surgeons' fees from charges for hospital services, apparatus and appliances furnished to the injured employee, and *to authorize the Workmen's Compensation Bureau to require the employer to furnish necessary treatment and appliances to an injured employee.* [Senate Bill No. 208 (1922) (emphasis added).]

Likewise, the Statement of Purpose to the Act's 1928 Amendment provided:

---

[1] The employer shall furnish to the injured workman *such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury* and to restore the functions of the injured member or organ where such restoration is possible; *provided, however,* that the employer shall not be liable to furnish or pay for physicians' or surgeons' services in excess of fifty dollars and in addition to furnish hospital services when necessary in excess of fifty dollars, unless the injured workman or the physician who treats him, or any other person on his behalf, shall file a petition with the Workmen's Compensation Bureau stating the need for such physician's or surgeon's services in excess of fifty dollars, as aforesaid, and such hospital service or appliances in excess of fifty dollars as aforesaid, *the Workmen's Compensation Bureau after investigating the need of the same and giving the employer an opportunity to be heard, shall determine that such physician's and surgeon's treatment and hospital services are or were necessary, and that the fees for the same are reasonable* and shall make an order requiring the employer to pay for or furnish the same.
[*L.* 1922, *c.* 245, § 1 (emphasis added).]

> The purpose of this act is to make plain that an employer must furnish an employee who has been permanently injured with an artificial limb or such *other appliances as shall be needful to relieve him as far as possible of the effects of the injury.*
>
> [*L.*1928, *c.* 1949 (emphasis added).]

Although this Court has liberally construed the Act to promote its beneficent purposes, we have always imposed the limitation that no expense incurred may be recovered that is not shown to be reasonable and necessary by sufficient competent medical evidence.

> The services must be shown by competent medical testimony to be such as are *reasonable* and *necessary* for the particular patient, taking into consideration his individual condition and need.
>
> [*Howard, supra,* 25 *N.J.* at 93 (emphasis added).]

We have also emphasized that claimant bears the burden thus to establish his claim. *Kahle v. Plochman, supra,* 85 *N.J.* at 548.

## II

Other jurisdictions have also liberally construed the terms "treatment" and "appliance" so as to allow such expenses as may be said to be reasonable and necessary for the cure of an ailment or relief of its symptoms. Courts have been generous in allowing recovery as "treatment" not only the cost of medical and hospital services, but also of necessary incidentals such as transportation, apparatus, and even nursing care furnished by a member of claimant's own family. 2 A. Larson, *Workmen's Compensation Law* § 61.00 (1983).

For instance, under the Florida Workmen's Compensation Statute, an act similar to ours,[2] an employer was required to

---

[2]Florida's Workmen's Compensation Statute provides in pertinent part:

(1) The employer shall furnish to the employee such remedial treatment, care, and attendance under the direction and supervision of a qualified physician or surgeon or other recognized practitioner, nurse or hospital, and for such period, as the nature of the injury or the process of recovery may require, including medicines, crutches, artificial members, and other apparatus. If the employer fails to provide the same after request by the injured

reimburse claimant for expenses incurred for child care. Claimant's inability to care for her child due to a work-connected injury resulted in the development of a severe depressive neurosis. In light of the extreme circumstances, the court held it medically necessary for treatment of her psychiatric condition and hence for claimant's recovery, that her daughter be placed in a nursery school. *Doctors Hosp. of Lake Worth v. Robinson*, 411 *So.*2d 958 (Dist.Ct.App.1982).

In *Talas v. Correct Piping Co., Inc.*, 435 *N.E.*2d 22, 27 (Ind.1982), the Supreme Court of Indiana awarded benefits for the palliative care of claimant, a quadriplegic, provided through nonprofessional nursing services while claimant's wife was working. The Court found that the nursing care was required to prevent the development of life-threatening disease, such as pneumonia; therefore the care could be said to be within the statutory requirement of being "necessary to limit or reduce the amount and extent of such impairment." Similarly, New York courts have been generous in their interpretation of what may constitute treatment. In *Mamone v. Griege*, 74 *A.D.*2d 656, 424 *N.Y.S.*2d 782, 783 (App.Div.1980) the claimant required three shifts of nurses per day, and medical testimony established it would not be in claimant's best interest to be in a nursing home; the court held the employer's insurance carrier should pay for all three shifts of nurses.

Moreover, a review of recent cases arising in other jurisdictions indicates that in those cases in which unique circumstances are present and claimant presents strong medical support for unusual relief requested (for example, the construction of a modular home, or a swimming pool), the courts are inclined to grant to claimant the requested relief.

---

employee, such injured employee may do so at the expense of the employer, the reasonableness and the necessity to be approved by the Commission. * * [Fla.Stat. § 440.13(1).]

For instance, in *Haga v. Clay Hyder Trucking Lines*, 397 *So.* 2d 428 (Fla.Dist.Ct.App.), review denied, 402 *So.*2d 609 (Fla. 1981), the employer of a double amputee who had suffered numerous complications after his injury was ordered to assume the reasonable costs for installation and maintenance of an in-ground pool with access facilities for the handicapped, or, in the alternative, to provide the claimant with daily access, along with reimbursement expenses, to a pool within a reasonable distance from claimant's home. In reliance upon the testimony of claimant's treating physicians and because of the claimant's severe and unusual injuries, the court held that the installation of a swimming pool was medically necessary to provide him with needed cardiovascular exercise as part of his rehabilitation program and to control his weight. *Id.* at 432; *see also Firestone Tire and Rubber Co. v. Vaughn*, 381 *So.*2d 740, 741 (Fla.Dist.Ct.App.1980) (court ordered employer of permanently disabled workman who had undergone 12 operations and whose three treating physicians recommended use of swimming facilities for exercise and relief of pain to provide injured workman with swimming pool, with title vesting in workman); *Cover v. T.G. & Y. and Seaboro Fire and Marine*, 377 *So.*2d 792 (Fla.Dist.Ct.App.1979) (court held that not only cost of chemicals for maintenance of swimming pool but also cost of repair of pump essential to use were reasonably awarded to claimant as costs of recommended therapy, pursuant to statute that provided for furnishing such apparatus to workmen as nature of injury required).

In *Peace River Elec. Corp. v. Choate*, 417 *So.*2d 831 (Fla. Dist.Ct.App.1982), petition for review dismissed, 429 *So.*2d 7 (Fla.1983), the court ordered that claimant be awarded rent-free use of a wheelchair-accessible modular home to replace the dilapidated wood shed he had been occupying. All title and right of ownership would remain in the employer, as would the responsibility to provide adequate maintenance. The claimant would assume responsibility for real estate taxes and assessments. The court there rejected the employer's suggested

alternative of remodeling claimant's existing dwelling since "nothing short of bulldozing the dwelling would serve to remedy the situation." *Id.* at 832.

In *Pine Bluff Parks and Recreation v. Porter*, 6 *Ark.App.* 154, 639 *S.W.*2d 363 (1982), although the relevant statute made no express provision for rental payments, the court ordered the employer of a paraplegic to assume liability for part of the rental cost of living in a project designed for paraplegics. The Workers' Compensation Commission, after hearing testimony from claimant's treating physician and from a hospital administrator, who himself was a quadriplegic, determined that the requested program in the special facility for the claimant was reasonable and necessary under the Arkansas Compensation Law. That law requires that an employer supply an employee with "services and apparatus" as necessitated by an employee's injuries. *Id.* at 366. Accordingly, the court held that the Commission should determine what portion of the total cost to the claimant of living in the special facility was attributable to those services and apparatus required to be furnished by the employer under the compensation law and what portion was noncompensable under that statute;[3] *Cf. Lane v. Walton Cottrell Assocs.*, 422 *So.*2d 1023 (Fla.Dist.Ct.App.1982) (under less extreme circumstances, claimant's request for alternative housing was denied because employer had obtained rental housing for claimant and had agreed to make such modifications as were required to make the residence wheelchair-accessible). *Contra Low Splint Coal Co., Inc. v. Bolling*, 224 *Va.* 400, 297 *S.E.*2d 665 (1982) (court's decision to disallow claimant's request for an improved entrance ramp at rear of residence and modifications to bathroom turned on language of particular

---

[3]The court recognized that the employer had a statutory obligation to furnish ramps, rails, wheelchairs, widened doors, special commodes, and shower facilities and other *apparatus* required by claimant. However, it questioned whether there existed any liability for custodial care, lodging, or other non-medical services such as housekeeping.

*Pine Bluff Parks, supra,* 639 *S.W.*2d at 366.

statute. Court found that such structural improvements could not be considered to be either "other necessary medical attention" or "reasonable and necessary vocational rehabilitation training services" within purview of Virginia Compensation Statute).

In sum, courts in other jurisdictions governed by statutes similar to ours have been generous in their liberal construction of the language in question. The phrases "other treatment" and "appliance" have assumed various forms, ranging from permanent round-the-clock nursing care to the rent-free use of a modular home. Moreover, the relief provided has not been limited to physical amelioration but has encompassed psychological relief as well. *See, e.g., Doctors Hosp. of Lake Worth v. Robinson, supra,* 411 *So.*2d 958. This relief, however, has been allowed only after a determination that such expenses are "reasonable and necessary" to relieve the injured worker of the effects of his injuries. *See, e.g., Haga v. Clay Hyder Trucking Lines, supra,* 397 *So.*2d 428.

It is important to note that in those cases in which courts have allowed recovery for unusual requests, for example, the construction of a swimming pool or use of a modular home, they have premised their decision on the unique circumstances of the particular case. In *Peace River Elec. Corp. v. Choate, supra,* 417 *So.*2d at 832, the court emphasized that "[c]learly, claimant has presented a 'set of extremely unique circumstances' combined with a 'request for highly extraordinary relief' * * *. Again, we caution that only extreme cases of disability might warrant such extraordinary relief." Similarly, in *Firestone Tire & Rubber Co. v. Vaughn, supra,* 381 *So.*2d at 741, the court stressed that "this affirmance is justified only because of the highly unique circumstances presented in this case," and in *Haga v. Clay Ryder Trucking Lines, supra,* 397 *So.*2d at 429, the same court noted that that "appeal present[ed] a set of extremely unique circumstances combined with a request for highly extraordinary relief." Further, the court admonished the bar not to misconstrue its opinion as counte-

nancing such extraordinary relief in cases involving less extreme circumstances. *Id.* In fact, after deciding *Haga*, which ordered construction of a swimming pool, and *Peace River*, which awarded claimant a modular home, in *Lane v. Walton Cottrell Assocs., supra*, 422 *So.*2d 1023, a case involving a less egregious set of facts, the same court denied claimant's request for alternative housing.

In view of the remedial nature of the New Jersey Workers' Compensation Act and the liberal construction accorded to it, we conclude that under certain unique circumstances, when there is sufficient and competent medical evidence to establish that the requested "other treatment" or "appliance" is reasonable and necessary to relieve the injured worker of the effect of his injuries, the construction of an apartment addition may be within the ambit of *N.J.S.A.* 34:15–15. We caution however that it is only the unusual case that may warrant such extraordinary relief.

## III

■ █ We find this to be such an "unusual case," and, consequently, the apartment addition is to be considered "other treatment" within the intendment of *N.J.S.A.* 34:15–15. The facts before us support this conclusion.

Dr. Sullivan testified that instead of the usual eight weeks required by most quadriplegics to recover, Squeo was unwell for about two and one-half years. He had "just about every complication that God ever put on earth for him." Squeo's living arrangements were further complicated by the fact that he had been living independently of his parents prior to his accident. As Dr. Sullivan testified, this *"is an unusual case* where the individual is twenty-five years old when he sustains the injury and he is already out on his own and now he has to be re-introduced into the family picture." (Emphasis added).

Apart from his quadriplegia, which cannot be reversed, and physical complications, which are treated as they arise, Squeo

has suffered serious psychological setbacks. No one disputes that these emotional problems are a result of his work-connected injury and its consequences. Nor is it disputed that Squeo's depression is so aggravated by living in the nursing home that he has tried to kill himself on three occasions. We find these three factors—Squeo's unremitting physical ailments, his age and his having lived independently of his parents for several years prior to the accident, and his psychological dread of institutional living, culminating in three suicide attempts—are sufficient to consider this an unusual case calling for unusual relief.

Moreover, we find that competent medical testimony exists on this record to hold that the construction of the apartment addition was reasonable and necessary treatment to relieve Squeo of his severe mental depression. *See Howard v. Harwood's Restaurant Co., supra,* 25 *N.J.* at 93.

It is undisputed that the nursing home is the worst place in the world for Squeo. Dr. Crain testified that Squeo's depression was rooted in the resentment and frustration he experienced while living in the nursing home, where he felt his life was neglected. He stated that continuous living in that nursing-home environment would certainly lead to yet another suicide attempt, and perhaps a successful one. Other witnesses, Anthony and Davis, testified that it was extremely important to the functional well-being of a disabled person that he be permitted to choose his own living environment. Anthony testified that lack of options makes the disabled "angry, frustrated and depressed." Davis opined that confining Squeo to a nursing home would condemn him "to a fate worse, worse than death." Further, the witnesses' testimony indicates that relegating Squeo to a state-sponsored facility would neither fulfill Squeo's psychological need for independent living, nor assuage his fear of institutional living, nor lessen his suicidal inclinations.

Squeo felt that life in a nursing home was no life at all. That feeling was not manifested by idle suicide threats but rather by

actual suicide attempts. Further confinement to the nursing home or any institutional setting would perpetuate the specter of suicide.

We stress that in determining what is reasonable and necessary, the touchstone is not the injured worker's desires or what he thinks to be most beneficial. Rather, it is what is shown by sufficient competent evidence to be reasonable and necessary to cure and relieve him. Here, that relief is of a psychological nature. The source of Squeo's severe mental depression is his fear of institutionalization. The testimony of all witnesses substantiates that this psychological disturbance can be relieved only by Squeo's living in an independent setting. Thus, we find sufficient credible evidence on the record to establish that construction of the apartment addition is necessary to cure and relieve the mental depression caused by Squeo's work-related injury.

■ There is also sufficient credible evidence to establish that the cost of the addition is reasonable. While there are no monetary limitations on the cost of treatment set forth in the statute, the cost must be reasonable. Both the compensation court and the Appellate Division were careful to restrict the cost of the proposed construction. Further, the Appellate Division provided the employer with protection against Squeo's failure to use the apartment by ordering Squeo's parents to execute a mortgage in the employer's favor. 194 *N.J.Super.* at 371.

■ We agree with the restrictions on the cost of the construction of the apartment imposed by both the compensation judge and the Appellate Division. We find that within the limits of such restrictions the cost of the construction of the apartment will be reasonable.

The award also appears reasonable when viewed in comparison to the cost of the available alternatives which the employer was willing to pay. Although the employer indicates that the cost of the apartment would be greater than that of the other

alternatives, no such evidence was submitted. In fact, while the cost of the proposed addition initially may be greater, in the long run it is likely to be far less than the expense of maintaining a young man in a nursing home or rental unit for the rest of his life.

We affirm the judgment of the Appellate Division. At oral argument we learned that the Squeos have constructed the apartment. Accordingly, we remand to the Division of Workers' Compensation for a determination as to the portion of the cost of the construction of the apartment for which the employer will be liable, within the restrictions set forth by the Division and the Appellate Division.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.