NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0102-18T3

VINCENT HAGER,

       Petitioner-Respondent/
Cross-Appellant,

v.

M&K CONSTRUCTION,

       Respondent-Appellant/
Cross-Respondent.

<table>
<tr><td><strong>APPROVED FOR PUBLICATION</strong><br><br><strong>January 13, 2020</strong><br><br><strong>APPELLATE DIVISION</strong></td></tr>
</table>

Argued October 29, 2019 – Decided January 13, 2020

Before Judges Yannotti, Currier and Firko.

On appeal from the New Jersey Department of Labor and Workforce Development, Division of Workers' Compensation, Claim Petition No. 2002-3715.

Matthew Gitterman argued the cause for appellant/cross-respondent (Biacamano & DiStefano, attorneys; James E. Santomauro, on the briefs).

Victor B. Matthews argued the cause for respondent/cross-appellant.

The opinion of the court was delivered by

CURRIER, J.A.D.

In this case of first impression, we consider whether a workers' compensation judge can order an employer to reimburse its employee for the employee's use of medical marijuana prescribed for chronic pain following a work-related accident. Respondent M&K Construction argues that the federal Controlled Substances Act (CSA), 21 U.S.C. § 841, which makes it a crime to manufacture, possess or distribute marijuana, preempts the New Jersey Compassionate Use Medical Marijuana Act (MMA)[1] because it is impossible to comply with both statutes.

M&K further contends the order violates the CSA because it requires the employer to aid and abet petitioner's possession of an illegal substance. M&K also asserts it should be treated similarly to a private health insurer, which is not required under the MMA to cover the costs of medical marijuana. Lastly, M&K contends the judge erred in failing to consider whether medical marijuana is a reasonable and necessary form of treatment under the Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to -146.

In a cross-appeal, petitioner argues the judge of compensation erred in not finding he has a 100% total and permanent disability.

---

[1] N.J.S.A. 24:6I-1 to -29. In July 2019, the title of the Act was amended to the "Jake Honig Compassionate Use Medical Cannabis Act."

Because we conclude the order does not require M&K to possess, manufacture or distribute marijuana, but only to reimburse petitioner for his purchase of medical marijuana, we discern no conflict between the CSA and MMA. Furthermore, M&K's compliance with the order does not establish the specific intent element of an aiding and abetting offense under federal law. We also conclude M&K is not a private health insurer. Therefore, it is not excluded under the MMA from reimbursing the costs of medical marijuana.

Here, where petitioner has demonstrated the severity and chronic nature of his pain, his attempts to unsuccessfully alleviate the pain with multiple surgeries and medical modalities, and the validated efficacy of the prescribed medical marijuana, we find the use of medical marijuana is reasonable and necessary. Finding no legislative or legal barrier to an employer's reimbursement of its employee's expense for medical marijuana in a workers' compensation setting, we affirm the order.

We also affirm the cross-appeal, deferring to the compensation judge's award of permanent partial disability of 65% of partial total.

I.

A.

In 2001, petitioner, then twenty-eight years old, was employed by M&K and working on a construction site, when a truck delivering concrete dumped

its load onto him. M&K denied petitioner's workers' compensation claim, stating it was investigating the matter. Fifteen years later, when the trial began in November 2016, M&K stipulated petitioner had sustained a compensable accident.

Following the accident, petitioner immediately experienced lower back pain that radiated down both legs, describing it as a "shooting and stabbing pain[]." He sought care with a chiropractor, who referred him for diagnostic testing. An MRI revealed a "large L5-S1 central disc herniation causing central canal stenosis" and "annular disc bulging at L4-5." Petitioner was instructed to see a neurosurgeon.

Petitioner initially used his private health insurance to pay for medical treatment to his back. However, in December 2001, when his pain prevented him from working, he left his employment with M&K, and his health insurance terminated in January 2002.[2] Thereafter, he could not afford the recommended diagnostic testing and treatment.

When M&K and its insurer continued to deny compensation benefits, petitioner retained counsel who referred him to a neurosurgeon, William Klempner, M.D. After petitioner was admitted to the emergency room in

---

[2] After the accident, petitioner continued to work at M&K on light duty. He was unable to work in any capacity after December 2001 due to his pain.

November 2003 with severe pain, Dr. Klempner performed a laminectomy and decompression of several nerve roots in petitioner's lumbar spine; petitioner mistakenly believed the medical expenses would be paid by M&K's workers' compensation carrier.

The surgery was unsuccessful in relieving petitioner's pain. In September 2004, after an EMG revealed extensive nerve damage to the lower extremities, Dr. Klempner recommended a spinal fusion. However, due to another medical condition, petitioner could not undergo the procedure.

When petitioner was able to resume treatment in September 2006, he consulted with Ari Ben-Yishay, M.D., a spinal surgeon, who recommended a two-level lumbar fusion. However, petitioner could not afford to pay out-of-pocket for the recommended surgery. Physicians within Dr. Ben-Yishay's practice prescribed Oxycodone.

In 2008, petitioner sought the care of another pain management doctor, Nicholas Leggiero, M.D. Petitioner paid the doctor's bills; Medicaid covered the costs of the medication.[3] Dr. Leggiero initially prescribed a regimen of opioid medications, but when petitioner's pain did not abate, Dr. Leggiero referred him to Michael Nosko, M.D., a neurosurgeon. Dr. Nosko performed a

---

[3] Petitioner was approved for supplemental social security income benefits in December 2005, entitling him to medical benefits through Medicaid.

A-0102-18T3

two-level lumbar fusion in September 2011. Following the surgery, petitioner wore a back brace for a year and underwent physical therapy. Medicaid paid for the surgical expenses.

This surgery was also unsuccessful in alleviating petitioner's pain, and Dr. Leggiero again prescribed opioids. Petitioner testified he was prescribed Oxycontin, Oxycodone, Valium, Lyrica, and other pain medications. In November 2015, Dr. Leggiero advised that petitioner suffered from "chronic debilitating pain." He stated further that "[i]t is highly unlikely that his condition could improve and unlikely that he will be able to return to work in any capacity in the future. His now long-term use of opiate medications has most likely caused hyperalgesia[4] and dependency that is unlikely to respond to other treatments."

B.

Petitioner was treating with Joseph Liotta, M.D., a board-certified hospice and palliative care physician, when his case went to trial in November

---

[4] Hyperalgesia is defined as "excessive sensitivity to pain." See Hyperalgesia, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/hypera-lgesia (last visited Dec. 12, 2019)

2016.[5]  Dr. Liotta is certified by the State of New Jersey to prescribe medical marijuana.

When Dr. Liotta first saw petitioner in April 2016, he diagnosed him as suffering from post-laminectomy syndrome with chronic pain as the result of spinal nerve injury.  Petitioner was also experiencing side effects from his use of Oxycodone.  The doctor testified that petitioner wanted "to come off the opioids, but then the pain w[ould] becom[e] too strong, so he was looking for an alternative to the opioids."

Dr. Liotta determined that petitioner was a candidate for the medical marijuana program due to his "intractable muscular skeletal spasticity, [and] chronic pain," and the doctor provided all the required documentation for petitioner's enrollment into the program.  He detailed at trial the extensive registration process a patient undergoes to obtain medical marijuana.  After petitioner was approved for the program in April 2016, Dr. Liotta provided him with a prescription for medical marijuana.

During a follow-up appointment in May 2016, petitioner told Dr. Liotta that the medical marijuana had provided some relief from his incessant pain, he was sleeping better, and he had stopped taking Oxycodone.  In the visits

---

[5]  The trial occurred over seven days between November 2016 and March 2018.

leading to trial, petitioner advised the doctor the medical marijuana was "controlling" his pain.

At trial, petitioner stated the medical marijuana treatment has given him some relief from pain. He stated:

> The pain is never going to go away, but [the treatment] helps to take the edge off the pain. It helps when the muscles spasm, and they lock up, it helps to relax those muscles. So simply put, it reduces the pain, and it takes the edge off the pain.

Petitioner continues to treat his pain with the prescribed two ounces of medical marijuana per month. He pays $616 a month out-of-pocket for the prescription. Dr. Liotta testified that petitioner will need medicine to manage his pain "for the rest of his life."

During his testimony, Dr. Liotta described the effects of marijuana in comparison to opioids. He stated that the long-term effects of marijuana are some memory loss, losing "emotional highs and lows[,]"[6] and potential lung damage from smoking the drug. Conversely, the long-term use of opioids can cause flash pulmonary edema, fatal arrhythmia, persistent itching, a higher risk of addiction, constipation, hemorrhoids, and fissures.

---

[6] This condition is Anhedonia, which is defined as the "inability to enjoy what is usually pleasurable." See Anhedonia, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/anhedonia (last visited Dec. 13, 2019).

Dr. Liotta depicted the chemical addiction to marijuana as "very weak" and "not nearly as potent as the chemical addiction to opioids." He also described the difficulty in withdrawing from opioids, stating "you can die from [it]. . . ." He agreed that over time both marijuana and opioids can become less effective in relieving pain as a patient becomes more tolerant of the substances.

After several days of trial, M&K reached an agreement with petitioner regarding medical bills, reimbursement for out-of-pocket medical expenses, temporary disability benefits, and third-party lien credits. The issues remaining for the compensation judge's determination were the award of permanent disability and future medical treatment.

Petitioner presented Cary Skolnick, M.D., as an expert witness in the field of orthopedic surgery. Dr. Skolnick diagnosed petitioner with post-laminectomy syndrome and opined his injuries were directly and causally related to his accident at work. The expert corroborated that petitioner's symptoms were consistent with the diagnosis and he would require long-term pain management. He concluded petitioner was "totally and permanently disabled as a functioning unit attributable to his orthopedic condition and opioid addiction as well as the medical marijuana," with a "65% of partial total relative to the lumbar spine."

M&K also presented an orthopedic surgeon – Gregory Gallick, M.D. Dr. Gallick testified that petitioner had "a decreased range of motion in his back, as what you would expect to see in an otherwise healthy 40-year-old individual." He found that petitioner could "work in a store," do "light activities," or drive a car or truck if he wished to do so. Dr. Gallick opined that petitioner had a 12.5% permanent partial disability related to his orthopedic injury. He advised he had no expertise concerning the use of medical marijuana.

M&K also produced Robert Brady, D.O., a pain management doctor. Although Dr. Brady is certified to prescribe medical marijuana in New Jersey, he has not done so for any of his patients. However, he conceded he has patients who are using medical marijuana for chronic back pain, and they have told him it provides them relief.

Dr. Brady was also asked about the effects of opioids versus medical marijuana. He explained that users of medical marijuana can experience "cognitive difficulties, problem solving cognition, short term memory loss, . . . hallucinations," an exacerbation of schizophrenia, "emphysema, COPD,[7]

---

[7] Chronic Obstructive Pulmonary Disease (COPD) is a term used for a group of lung diseases that block the airways and make breathing more difficult. See Chronic Obstructive Pulmonary Disease, The Free Dictionary, http://medical-

[and] lung cancer."  As for opioids, Dr. Brady said a person could experience "addiction, tolerance, overdose, death, constipation, depression, [and] sexual dysfunction."

Dr. Brady agreed that both substances were physically addictive, marijuana less so than opioids, and both were psychologically addictive.  The doctor testified further that he believed petitioner was addicted to opioids, and it was also possible he was addicted to marijuana because he "relie[d] on the medication."  Dr. Brady concluded that petitioner should not be treated with medical marijuana because the literature did not show it was helpful to people with non-malignant back pain.  He believed the only recommended course of treatment for petitioner was physical therapy.  In response to the judge's question as to what petitioner could do about his pain, Dr. Brady responded: "Unfortunately, sometimes people have pain."

During the trial, petitioner described his chronic pain.  He stated the pain starts in his lower back and radiates down both legs.  He has constant pain in his back and his entire left leg to his toes.  The pain also radiates down his right leg to just below the buttocks.  Petitioner stated the intensity of the pain varied from a dull aching pain to a sharp stabbing pain from his lower back to

dictionary.thefreedictionary.com/Chronic+Obstructive+Pulmonary+Disease (last visited Dec. 12, 2019).

A-0102-18T3

his toes. Petitioner described the pain as affecting "every activity of his daily life." He was only able to stand for a half hour to an hour at a time. His pain was slightly lessened by lying down. He was unable to work and lived with his parents.

## C.

On July 26, 2018, the judge of compensation issued a written decision, finding: 1) the present condition of petitioner's lumbar spine and all consequences related to it were causally related to his accident at work; and 2) petitioner exhibited permanent partial total disability of 65%, with 50% attributed to his orthopedic condition and 15% attributed to the effects of medical marijuana. The judge ordered M&K to reimburse petitioner for the costs of medical marijuana and any related expenses. A July 30, 2018 order memorialized the opinion.

The judge found petitioner to be credible and noted all of the experts agreed that he suffered from chronic non-malignant back pain. He rejected Dr. Brady's position that petitioner should "simply deal with his pain," finding that contention "unacceptable as inhumane and contrary to the law concerning [an employer's] obligation to treat."

Because the experts agreed there were only two treatment options to alleviate petitioner's pain – opioids or marijuana – the compensation judge turned to a comparison of the therapies:

> There is no real disagreement among the experts concerning the side effects and risks attendant to those two modalities. . . . Dr. Brady and Dr. Liotta agree that opioids cause significant adverse consequences, including the risk of death. They both agree that opioids are significantly more physically addicting than marijuana, although both modalities are psychologically addict[ing]. . . . This [c]ourt concludes that, if the only choice for [petitioner] is between opioids and marijuana, then marijuana is the clearly indicated option. Both modalities present significant downsides in terms of adverse consequences and risks, but a comparison leads inescapably to a conclusion that marijuana is the appropriate option. This [c]ourt finds credible the testimony of [p]etitioner and Dr. Liotta that the pain mitigation effect is equal at this time and finds the testimony of Dr. Brady lacking in credibility and rather disingenuous.

The judge noted Dr. Leggiero's determination in 2015 that petitioner was addicted to opioids and unlikely to recover. However, through the medical marijuana program, petitioner was able to improve his condition and had been opioid-free for several years. Therefore, the judge concluded the benefits of medical marijuana were superior to the use of opioids and the use of medical marijuana was in petitioner's best interests. Dr. Liotta was designated as the authorized treating physician "with the authority to incorporate such additional

13                                                                      A-0102-18T3

treatment modalities as may be necessary and in the best interests of [p]etitioner."

## II.

Our review of an order of a judge of compensation is limited to determining "whether the findings . . . could reasonably have been reached on sufficient credible evidence present in the whole record, after giving due weight to [the judge's] expertise in the field and [his or her] opportunity of hearing and seeing the witnesses." De Angelo v. Alsan Masons, Inc., 122 N.J. 14Super. 88, 89-90 (App. Div. 1973) (citing Jackson v. Concord Co., 54 N.J. 113, 117-18 (1969); Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). Our review of a judge's interpretation of an issue of law is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citing State v. Brown, 118 N.J. 595, 604 (1990)).

## A.

We begin our analysis by addressing M&K's argument that the CSA preempts the MMA because it is impossible to simultaneously comply with both statutes. To do so, we provide some background.

Under federal law, marijuana[8] is a Schedule I controlled substance.  See 21 U.S.C. § 812(c), Schedule I(c)(10); 21 C.F.R. § 1308.11, Schedule I(d)(23), (31).  The CSA, passed in 1970, placed marijuana in Schedule I, the most restrictive of categories, defining it as a drug with a high potential for abuse, no currently accepted medical use for treatment, and lacking acceptable safety uses even under medical supervision.  21 U.S.C. § 812(b)(1).

Because of its classification as a Schedule I drug, "the manufacture, distribution, or possession of marijuana [is] a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study."  Gonzales v. Raich, 545 U.S. 1, 14 (2005) (citations omitted).  The production or distribution of marijuana is a felony offense under federal law.  See 21 U.S.C. § 841.[9]

---

[8]  It is spelled "Marihuana" under the statute.

[9]  In contrast, opioids are a Schedule II substance under the CSA and are considered an accepted medical use in treatment in the United States; see also 21 U.S.C. § 812. U.S. Drug Enforcement Agency, Drug Scheduling, https://www.dea.gov/drug-scheduling (last visited Dec. 12, 2019).

In 2010, New Jersey enacted the MMA which decriminalized the possession of a certain amount of marijuana for medical use by qualifying patients. N.J.S.A. 24:6I-6.[10] In doing so, the Legislature found that:

> a. Modern medical research has discovered a beneficial use for cannabis in treating or alleviating the pain or other symptoms associated with certain medical conditions, as found by the National Academy of Sciences' Institute of Medicine in March 1999.
>
> b. According to the U.S. Sentencing Commission and the Federal Bureau of Investigation, 99 out of every 100 cannabis arrests in the country are made under state law, rather than under federal law. Consequently, changing state law will have the practical effect of protecting from arrest the vast majority of seriously ill people who have a medical need to use cannabis.
>
> c. Although federal law currently prohibits the use of cannabis, the laws of [twenty-seven states], and the District of Columbia permit the use of cannabis for medical purposes, . . . . New Jersey joins this effort for the health and welfare of its citizens.
>
> d. States are not required to enforce federal law or prosecute people for engaging in activities prohibited by federal law; therefore, compliance with this act does not put the State of New Jersey in violation of federal law.
>
> e. Compassion dictates that a distinction be made between medical and non-medical uses of cannabis.

---

[10] A "qualified patient" is "a resident of [New Jersey] who has been authorized for the medical use of cannabis by a health care practitioner." N.J.S.A. 24:6I-3.

16

> Hence, the purpose of this act is to protect from arrest, prosecution, property forfeiture, and criminal and other penalties, those patients who use cannabis to alleviate suffering from qualifying medical conditions, as well as their health care practitioners, designated caregivers, institutional caregivers, and those who are authorized to produce cannabis for medical purposes.
>
> [N.J.S.A. 24:6I-2.]

As stated, the MMA affords an affirmative defense to patients who are properly registered under the statute but are nevertheless arrested and charged with possession of marijuana. N.J.S.A. 2C:35-18. The MMA also shields qualifying users of medical marijuana from civil penalties and other administrative actions. N.J.S.A. 24:6I-6(b).

M&K asserts that the CSA preempts the MMA, and the compensation judge's order violates the CSA. We look to the Supremacy Clause, U.S. Const., art. VI, cl. 2, as the rule of decision guiding a court when federal and state law are in conflict. Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324 (2015). The first step in the analysis, whether the federal law is a valid exercise of power, is not challenged here.

The second step, "[w]hether a state law stands as an obstacle to the accomplishment of a federal objective, requires a court to consider 'the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'" R.F. v. Abbott Labs., 162 N.J. 596, 618

(2000) (quoting <u>Jones v. Rath Packing Co.</u>, 430 U.S. 519, 526 (1977)). "Determining whether federal law preempts state law is a fact-sensitive endeavor, based on a court's review of 'fragments of statutory language, random statements in the legislative history, and the degree of detail of the federal regulation.'" <u>Id.</u> at 619 (citing Erwin Chemerinsky, <u>Constitutional Law: Principles and Policies</u>, § 5.2 (1st ed. 1997)). Preemption "is not to be lightly presumed." <u>Ibid.</u> (quoting <u>Turner v. First Union Nat'l Bank</u>, 162 N.J. 75, 87 (1999)).

State law is preempted by federal law under three circumstances: express, field, and conflict preemption. It is conflict preemption that is at issue here. Under 21 U.S.C. § 903, Congress expressed its intention regarding the consequence of any conflict between the CSA and a state law. The statute provides that the CSA's preemption is restricted to circumstances where "there is a positive conflict between" a provision of Title 21 and a state law "so that the two cannot consistently stand together." 21 U.S.C. § 903. Therefore, Congress instructs that conflict preemption is the appropriate measurement.

Conflict preemption applies when "it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" <u>English v. Gen. Elec. Co.</u>, 496 U.S. 72, 79 (1990)

(first citing <u>Fla. Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132, 142-43 (1963); and then quoting <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67 (1941)). We, therefore, must determine whether an order by a compensation judge to reimburse a user of medical marijuana can comply with both federal and state law, here the CSA and MMA. If an eligible patient can comply with both the CSA's prohibition of the manufacture, possession or distribution of marijuana, and the MMA's decriminalization of the possession of marijuana for medical use, there is no "positive conflict" that triggers preemption. <u>Beek v. City of Wyo.</u>, 846 N.W.2d 531, 537-38 (Mich. 2014).

B.

The issue of whether the MMA is preempted by the CSA in the context of a workers' compensation case has not been addressed by any New Jersey state court. Of the thirty-three states[11] that have legalized medical marijuana, only New Mexico and Maine have considered whether their medical marijuana legislation is preempted by the CSA. <u>See</u> <u>Lewis v. Am. Gen. Media</u>, 355 P.3d 850, 858 (N.M. Ct. App. 2015) (finding New Mexico's medical marijuana act

---

[11] The District of Columbia, Guam and Puerto Rico have also enacted compassionate use of medical marijuana use legislation. Allison N. Zsamba, <u>Cannabis Tax Plans: Consideration for New Jersey's Future</u>, <u>N.J. Law.</u>, Dec. 2019, at 43 n.2. Fifteen states and the District of Columbia have decriminalized the possession of a certain amount of marijuana; eleven states and the District of Columbia have legalized recreational marijuana. <u>Id.</u> at 43 n.2-3.

was not preempted by the CSA); Vialpando v. Ben's Auto. Servs., 331 P.3d 975, 976 (N.M. Ct. App. 2014) (same); but see Bourgoin v. Twin Rivers Paper Co., 187 A.3d 10, 12 (Me. 2018) (determining that Maine's medical marijuana act was preempted by the CSA).

In enacting the MMA, "the Legislature expressed its intent to steer clear of such a conflict, declaring that 'compliance with this act does not put the State of New Jersey in violation of federal law.'" Kadonsky v. Lee, 452 N.J. Super. 198, 215 (App. Div. 2017) (quoting N.J.S.A. 24:6I-2(d)). Despite that intention, M&K contends it is physically impossible for an employer to comply with both the CSA and MMA, therefore the MMA is preempted under a conflict analysis. We disagree.

As stated, Congress has expressed its intent in the plain language of the CSA that it only preempts a state law that requires the performance of an action specifically forbidden by the federal statute. 21 U.S.C. § 903. A hypothetical conflict does not suffice to satisfy conflict preemption. See Solorzano v. Superior Court, 13 Cal. Rptr. 2d 161, 169 (Cal. Ct. App. 1992) (stating that "mere speculation about a hypothetical conflict is not the stuff of which preemption is made.").

Under the CSA, the possession, manufacture, and distribution of marijuana is a criminal and punishable offense. But an employer's

reimbursement of a registered MMA patient's use of medical marijuana does not require the employer to commit those offenses.

The MMA also does not prohibit punishment for those offenses under federal law. Instead, the MMA accords limited state-law immunity from "arrest, prosecution, . . . and criminal and other penalties" to individuals who utilize medical marijuana in compliance with the Act. N.J.S.A. 24:6I-2(e). This immunity does not prohibit the federal government from criminalizing or punishing that conduct. Nor does the MMA bar federal regulation and enforcement. See United States v. Hicks, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010) ("It is indisputable that state medical-marijuana laws do not, and cannot, super[s]ede federal laws that criminalize the possession of marijuana.") (citing Raich, 545 U.S. at 29).

The MMA does not require an employer to possess, manufacture or distribute marijuana – the actions proscribed by the CSA. Because it is not physically impossible to comply with the CSA and the MMA, there is no positive conflict between these laws.

M&K also asserts that the CSA preempts the MMA because it would be aiding and abetting petitioner in the commission of a crime, the possession of marijuana, if it reimbursed him for medical marijuana as ordered by the compensation judge. We are not persuaded.

Under 18 U.S.C. § 2(a), "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal."  The statute does not establish a separate crime but merely eliminates "the common law distinction between principal and accessory." United States v. Langston, 970 F.2d 692, 705-06 (10th Cir. 1992) (citing United States v. Smith, 838 F.2d 436, 441 (10th Cir. 1988)).

To obtain a conviction on an aiding and abetting theory, the government must prove a defendant: "[(1)] in some sort associate himself with the venture, [(2)] that he participate in it as in something that he wishes to bring about, [and (3)] that he seek by his action to make it succeed." Nye & Nissen Corp. v. United States, 336 U.S. 613, 619 (1949) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)).

Under the circumstances presented here, M&K is not an active participant in the commission of a crime.  The employer would be complying with an order requiring it to reimburse a person for the legal use of medical marijuana under this state's law.  M&K has not established the requisite intent and active participation necessary for an aiding and abetting charge.

We further note that "one cannot aid and abet a completed crime." United States v. Ledezma, 26 F.3d 636, 642 (6th Cir. 1994) (citing Roberts v. United States, 416 F.2d 1216, 1221 (5th Cir. 1969)).  Here, M&K is not

purchasing or distributing the medical marijuana on behalf of petitioner; it is only reimbursing him for his legal use of the substance. In addition, petitioner has obtained the medical marijuana before M&K reimburses him. M&K is never in possession of the marijuana. Therefore, the federal offense of purchasing, possessing or distributing has already occurred. M&K cannot abet the completed crime. The compensation judge's order directing an employer to reimburse its employee for the use of prescribed and regulated medical marijuana is not prohibited under a federal preemption argument.

C.

We also address M&K's argument that compliance with the order exposes it to the threat of federal prosecution for aiding and abetting petitioner in the possession of marijuana. In considering this argument, we first note that "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there is between them.'" Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166-67 (1989) (alteration omitted) (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 256 (1984)). Here, there is evidence of tolerance from the federal government of state-legislated medical marijuana.

A-0102-18T3

Since December 2014, "congressional appropriations riders have prohibited the use of any [Department of Justice] funds that prevent states with medical marijuana programs . . . from implementing their state medical marijuana laws." United States v. Kleinman, 880 F.3d 1020, 1027 (9th Cir. 2018) (citing Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-13, § 542, 129 Stat. 2242, 2332-33 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135, 228 (2017)). The funding prohibition remains in effect. See Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138 (2019).

M&K has presented no evidence that it faces a credible threat of prosecution. Despite the enactment of medical marijuana legislation by the majority of states, M&K could not apprise this court of any federal prosecution against an employer or insurance carrier for its reimbursement of authorized medical marijuana treatment. As stated above, a speculative argument cannot support a finding of conflict preemption. See Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1137 (9th Cir. 2000) (stating if no enforcement action or prosecution is threatened or imminent, the dispute is premature); Sibley v. Obama, 819 F. Supp. 2d 45, 49-50 (D.D.C. 2011)

(determining a plaintiff who asserted he risked prosecution under the CSA did not have standing because the deputy attorney general's memorandum did not establish a threat of prosecution for marijuana-related offenses was credible, actual, immediate, or even specific to the plaintiff); State v. Okun, 296 P.3d 998, 1002 (Ariz. App. 2013) (refusing to address whether the CSA preempts Arizona's medical marijuana act under an impossibility analysis because no actual or threatened prosecution existed).

## III.

### A.

Having found no positive conflict between the CSA and MMA, we consider M&K's additional arguments. First, M&K argues a workers' compensation insurer should be treated the same under the MMA as a private health insurer, which may not be required to cover the costs of medical marijuana. We disagree.

N.J.S.A. 24:6I-14 states: "Nothing in [the MMA] shall be construed to require a government medical assistance program or private health insurer to reimburse a person for costs associated with the medical use of cannabis, . . . ." The statute does not define "private health insurer." However, under Title 17, in defining "health insurance," the Legislature expressly stated that "[h]ealth insurance does not include workmen's compensation coverage[]." N.J.S.A.

17B:17-4. We presume the Legislature is aware of its own enactments in passing a law. In re Petition for Referendum on City of Trenton Ordinance 09-02, 201 N.J. 349, 359 (2010).

Here, New Jersey has only designated two categories of entities that may not be required to reimburse the costs of medical marijuana: government medical assistance programs or private health insurers. N.J.S.A. 24:6I-14. The use of "or" between the subjects indicates the Legislature's intent to provide an exhaustive list of third parties exempt from reimbursement. See O'Connell v. State, 171 N.J. 484, 488 (2002) (quoting Hubbard v. Reed, 168 N.J. 387, 392 (2001); State v. Butler, 89 N.J. 220, 226 (1982)). If the Legislature wished to relieve workers' compensation insurers from any obligation to pay the costs of medical marijuana, it would have done so.

B.

Lastly, M&K argues the judge of compensation erred in failing to consider whether medical marijuana can be a reasonable and necessary form of treatment under the WCA because it is illegal under the CSA; and the judge failed to consider alternative legal modalities of treatment. Again, we disagree.

Under the WCA, an employer must provide a worker injured in the course of employment with medical treatment and services necessary "to cure

26                                                          A-0102-18T3

and relieve the worker of the effects of the injury and to restore the functions of the injured member or organ" if possible. N.J.S.A. 34:15-15.  The WCA is to be liberally construed in favor of employees.  Squeo v. Comfort Control Corp., 99 N.J. 588, 599 (1985).

"If the workers' compensation court finds the injury compensable and the medical services reasonable and necessary, the employer is responsible for the expenses incurred by the employee for the treatment of the injury."  Univ. of Mass. Mem'l Med. Ctr., Inc. v. Christodoulou, 180 N.J. 334, 345 (2004) (citing N.J.S.A. 34:15-15).   The expense must be "shown to be reasonable and necessary by sufficient competent medical evidence."  Squeo, 99 N.J. at 599.

"[I]n determining what is reasonable and necessary, the touchstone is not the injured worker's desires or what he thinks to be most beneficial.  Rather, it is what is shown by sufficient competent evidence to be reasonable and necessary to cure and relieve him."  Id. at 606.  The "claimant bears the burden . . . to establish his claim."  Id. at 599 (citing Kahle v. Plochman, 85 N.J. 539, 548 (1981)).

Here, petitioner testified extensively about his pain, stating he continued to suffer from pain in his lower back that goes down both legs.  He described the pain as "an electric switch."  Petitioner also explained how the pain limits his activities, testifying "the more I move the more it hurts."  He stated he had

"trouble sitting and standing for any period[] of time" and "[b]ending is very painful."

Severe or chronic pain is considered a qualifying medical condition under the MMA, and is an eligible condition authorized for the treatment of medical marijuana. See N.J.S.A. 24:6I-3. During the trial, petitioner described how medical marijuana helped with his symptoms. He stated that it "take[s] the edge off the pain," and relaxed his muscles, alleviating the muscle spasms.

Moreover, petitioner supported his account of chronic pain with "competent medical testimony . . . ." Squeo, 99 N.J. at 599 (quoting Howard v. Harwood's Rest. Co., 25 N.J. 72, 93 (1957)). Drs. Liotta and Skolnick testified that petitioner suffered from "post laminectomy syndrome," described by Dr. Liotta as "where [a person] get[s] chronic pain from nerves being injured in the spine as they exit the spine, and the bones need . . . [to] be stabilized by hardware. . . ." Dr. Liotta advised that the pain was "irreversible," and petitioner would need to manage his pain "for the rest of his life." Dr. Skolnick agreed that petitioner would require "long-term pain management." We are satisfied that under the circumstances of this petition, the use of medical marijuana was reasonable and necessary for the treatment of petitioner's chronic pain.

28

Both Dr. Liotta and Dr. Brady addressed the different side effects of medical marijuana and opioids. The doctors agreed that the treatment of pain with opioids carried a risk of death, and that opioids were significantly more addictive than marijuana. The compensation judge considered both treatment methods and concluded that medical marijuana was the "clearly indicated option." It is evident the judge weighed the alternative legal modalities of treatment available to petitioner.

IV.

New Jersey has expressed its clear public policy towards the use of medical marijuana in the MMA. The statute notes the medical research demonstrating the beneficial use of marijuana to alleviate the pain and symptoms of certain medical conditions, including severe or chronic pain. N.J.S.A. 24:6I-2 to -3. Conversely, the federal attitude towards marijuana is equivocal. M&K has not demonstrated any intention by the federal government to enforce the CSA in any state that has decriminalized medical marijuana.

For over eighteen years, petitioner has endured chronic disabling pain resulting from a work-related injury. He has undergone multiple unsuccessful lumbar surgeries and pursued all recommended modalities of treatment – nothing relieved his pain. Petitioner and Dr. Liotta testified as to the

beneficial effects medical marijuana can achieve for chronic pain and specifically for petitioner's pain level. Its use has also allowed petitioner to cease using opioids. That achievement, by itself, in light of the opioid crisis in existence today, should suffice as a rationale for the reimbursement of medical marijuana.

To deprive petitioner of the only relief from the constant pain he has experienced for almost twenty years would eviscerate the principles and goals of the WCA and MMA. As M&K has not presented this court with any concrete legal or legislative grounds upon which to overturn the compensation judge's order, we affirm the order for reimbursement of petitioner's use of medical marijuana.

V.

In his cross-appeal, petitioner asserts the compensation judge should have concluded he was permanently and totally disabled in light of his inability to work due to the combined effects of his chronic pain and ongoing need for treatment. Because of the deference accorded to a compensation judge's findings, we affirm.

In finding petitioner had a 65% permanent partial total disability, the compensation judge found it was "constrained by the fact that no expert opine[d] that [petitioner] [wa]s presently totally disabled." Although initially

30

Dr. Skolnick testified petitioner was "100% totally and permanently disabled," he later stated that if petitioner could wean himself off opioids, "[h]e might be less than total." In addition, Dr. Skolnick's expert report opined that petitioner had an estimated permanent orthopedic disability of 65% of partial total relative to the lumbar spine.

"The compensation [judge] had the opportunity to evaluate [the] witnesses' credibility." Ramos v. M & F Fashions, Inc., 154 N.J. 583, 598 (1998). The compensation judge also has "expertise with respect to weighing the testimony of competing medical experts and appraising the validity of [petitioner's] compensation claim." Ibid. (citing Lewicki v. N.J. Art Foundry, 88 N.J. 75, 89 (1981) (noting deference is entitled to compensation courts due to their expertise)). The record demonstrates sufficient credible evidence supported the finding of permanent partial disability.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION